# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### February 1, 2007 Session

## PHIL BREDESEN, Governor of the State of Tennessee v. TENNESSEE JUDICIAL SELECTION COMMISSION, ET AL.

**Direct Appeal from the Chancery Court for Davidson County**
**No. 06-2275-III     Ellen H. Lyle, Chancellor**

---

**No. M2006-02722-SC-RDM-CV - Filed on February 21, 2007**

---

This appeal concerns the process for appointing a new justice to become the fifth member of the Tennessee Supreme Court. The issues in this case involve the proper interpretation of sections 17-4-101 to 17-4-118 of the Tennessee Code Annotated ("the Tennessee Plan") and matters of constitutional law. For the reasons stated below, we hold that: (1) the first list of nominees certified to the Governor under the Tennessee Plan was not rendered invalid upon one nominee's subsequent withdrawal from consideration for appointment; (2) an individual listed on a panel of nominees certified to the Governor by the Tennessee Judicial Selection Commission ("the Commission") which has been rejected by the Governor may not be included on the second panel of nominees certified to the Governor under the Tennessee Plan; (3) the Governor's rejection of Lewis and Gordon did not violate the Tennessee Human Rights Act ("THRA") because a nominee or applicant to fill a judicial vacancy is not an "employee" for purposes of the THRA; (4) the equal protection challenge to the Governor's rejection of the first panel is a non-justiciable political question; (5) the equal protection challenge to the Governor's rejection of the first panel is otherwise without merit; (6) the Governor's letter rejecting the first list of nominees did not encroach on the powers assigned to the Commission by the Tennessee Plan; and (7) the trial court erred in its determination of the appropriate remedy.

**Tenn. Code Ann. § 16-3-201(d); Judgment of the Chancery Court Affirmed, As Modified**

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which JANICE M. HOLDER and CORNELIA A. CLARK, JJ., and E. RILEY ANDERSON, SP. J., joined.[1]

---

[1] In an order filed on January 18, 2007, Justice Gary R. Wade recused himself from the adjudication of this appeal. Justice E. Riley Anderson (retired) was appointed by the Court to serve as Special Justice, in place of Justice Wade.

Charles W. Bone and Charles Robert Bone, Nashville, Tennessee; Lyle Reid, Brownsville, Tennessee; and Irma Merrill Stratton and Timothy W. Smith, Memphis, Tennessee, for the appellant, J. Houston Gordon.

John Spaulding Hicks, Nashville, Tennessee, for the appellant, George T. Lewis, III.

Robert E. Cooper, Jr., Attorney General and Reporter, and Janet M. Kleinfelter, Senior Counsel, for the appellee, Governor Phil Bredesen.

Ben H. Cantrell, Nashville, Tennessee, for the appellee, Tennessee Judicial Selection Commission.

## OPINION

The facts of this case are undisputed. In early 2006, Justices E. Riley Anderson and Adolpho A. Birch, Jr., each announced that they would be retiring from the Tennessee Supreme Court at the end of their terms of office, August 31, 2006. Soon after those announcements, the Tennessee Judicial Selection Commission began the statutory process for filling the vacancies which would occur upon Justices Anderson's and Birch's retirements. One of the expected vacancies was subsequently filled by the Governor's appointment of Justice Gary R. Wade, then Presiding Judge of the Court of Criminal Appeals.

Following the appointment of Justice Wade, the Judicial Selection Commission initiated the process for filling the second expected vacancy on the Court. On July 18, 2006, the Commission certified by letter to the Governor the names of three nominees for the vacancy: Richard H. Dinkins, J. Houston Gordon, and George T. "Buck" Lewis.

Approximately one week later, on July 24, 2006, Richard H. Dinkins submitted a letter to the Governor withdrawing his name from consideration for appointment to the Supreme Court. That same day, Governor Bredesen wrote a letter to the Chairman of the Judicial Selection Commission; the body of the Governor's letter states in its entirety:

> I am writing to return to the Judicial Selection Commission the panel of nominees certified to me last week for the vacancy on the Tennessee Supreme Court. I have received a letter from Chancellor Richard Dinkins withdrawing his name as one of the three nominees, and therefore I am requesting pursuant to Tenn. Code Ann. § 17-4-112(a) that the Commission submit a new panel of nominees.
>
> I appreciate the outstanding work that Chancellor Dinkins has done as a trial court judge, and I respect his decision to put his children's needs ahead of his career. This State has been privileged over the past thirteen years to have an excellent Supreme Court that reflects the diversity of Tennessee. As you know, I have always sought to appoint judges who meet the highest professional and personal standards.

-2-

Among such highly qualified persons, diversity is a significant factor that I believe should be considered. With Chancellor Dinkins' withdrawal, I no longer have the opportunity to consider that factor.

I therefore request that the Commission send me a new panel of nominees that includes qualified minority candidates. I further request that the Commission select the new panel as expeditiously as possible, so that I can make this appointment before September 1st, when the court vacancy occurs.

On August 9, 2006, the Chairman of the Judicial Selection Commission wrote a letter to Governor Bredesen, noting that the Commission had met the preceding day. The Chairman's letter stated that "[t]he Commission voted to request the governor to clarify, in writing, if he intended to reject the entire panel in his July 24, 2006 letter and if so, his reasons for rejecting the panel." The Governor responded in a letter (also dated August 9) to the Chairman of the Commission, stating:

In my previous letter, I requested that the Judicial Selection Commission submit to me a new panel of nominees for the vacancy on the Tennessee Supreme Court pursuant to Tenn. Code Ann. § 17-4-112(a). By invoking Section 17-4-112(a), I rejected the first panel of nominees. Please accept this letter as a reaffirmation that I rejected the panel for the reason stated in my previous letter, which is attached and incorporated herein.

On August 22, 2006, the Judicial Selection Commission met and passed a resolution stating, in summary, that the remaining eight original applicants (following Richard H. Dinkins' withdrawal of his name from consideration) would be considered for the second panel to be submitted to the Governor; the Commission also reopened the application process to allow others to file applications, setting a new deadline of August 29, 2006, for the filing of applications. The resolution also stated that "the Commission is committed to submitting a diverse body of qualified candidates to the Governor for consideration, and therefore deems a per se exclusion of an applicant solely on the basis of his or her race to be unconstitutional."

Seventeen individuals (including the remaining eight original applicants) timely qualified for consideration by the Commission. On September 5, 2006, the Commission met to select the second panel of nominees for the vacancy on the Court. In a letter dated September 7, 2006, the Commission certified to the Governor the names of D'Army Bailey, J. Houston Gordon, and William C. Koch, Jr., as the second panel of nominees.

On September 18, 2006, the Governor (represented by the Attorney General & Reporter) filed a "complaint for declaratory judgment" in the Davidson County Chancery Court, seeking a ruling as to the validity of the second panel. The complaint alleged that the Governor's rejection of the first panel constituted a rejection of each of the nominees on that panel and that "in submitting a second panel to the Governor, the Tennessee Plan requires that the Commission submit a panel that contains three new nominees and does not include one or more of the rejected nominees from the first panel."

The Governor went on to allege in the complaint that the second panel submitted to him by the Commission is "not a validly constituted panel pursuant to Tenn. Code Ann. § 17-4-112(a) as it contains the name of a rejected nominee from the first panel." The complaint concluded by asking the trial court to declare that "Plaintiff [the Governor] has no legal duty to make any appointment to fill the current vacancy in the Supreme Court pursuant to Tenn. Code Ann. § 17-4-112(a), unless and until the Commission submits a panel that is validly constituted in accordance with Tenn. Code Ann. § 17-4-112(a)[.]"

The Tennessee Judicial Selection Commission was named as the defendant in the complaint filed by the Governor. The trial court subsequently permitted J. Houston Gordon and George T. "Buck" Lewis to intervene in the proceedings. The court scheduled a hearing on December 13, 2006, for oral arguments on the parties' respective motions for summary judgment.

On December 14, 2006, the trial court issued its memorandum opinion and order, granting the Governor's motion for summary judgment, effectively ruling in favor of the Governor on all issues. The court ordered the Commission to remove J. Houston Gordon's name from the list of nominees on the second panel and to select a third nominee from the remaining previous applicants for the second vacancy and to certify his or her name to the Governor.

Gordon and Lewis both filed notices of appeal. Gordon also filed in the trial court a motion for a stay pending appeal. Gordon and Lewis simultaneously filed motions in the Supreme Court, requesting that this Court assume jurisdiction of the appeal, pursuant to Tennessee Code Annotated section 16-3-201(d) (Supp. 2006) (the "reach-down statute"). In his reach-down motion, Gordon also moved this Court to stay the trial court's judgment pending the appeal. The Governor filed a response to the reach-down motions, agreeing with the request that this Court assume jurisdiction of this appeal.

On January 2, 2007, the trial court denied the motion for a stay pending appeal. On January 3, this Court granted the two reach-down motions and thereby assumed jurisdiction of the appeal; we also adopted an expedited briefing schedule and set the case for oral argument on February 2, 2007. Due to a public announcement by the Chairman of the Judicial Selection Commission that the Commission would take no further action pending this appeal, we denied Gordon's motion for a stay.

## STANDARD OF REVIEW

The issues presented for review—issues of statutory construction and constitutional law—are questions of law which this Court reviews de novo with no presumption of correctness accorded to the trial court's conclusions. State v. Burns, 205 S.W.3d 412, 414 (Tenn. 2006); Killingsworth v. Ted Russell Ford, Inc., 205 S.W.3d 406, 408 (Tenn. 2006); Lavin v. Jordon, 16 S.W.3d 362, 364 (Tenn. 2000); Union Carbide Corp. v. Huddleston, 854 S.W.2d 87, 91 (Tenn. 1993).

## ANALYSIS

The appellants, J. Houston Gordon and George T. "Buck" Lewis, have raised separate issues in their respective briefs. In addition, the Tennessee Judicial Selection Commission has raised other issues in its brief. Because three of the four parties raise separate issues for the Court's review, the following analysis will be organized by reference to each of those parties. We begin, however, with an overview of the "Tennessee Plan."

## I. THE TENNESSEE PLAN

In 1994, the General Assembly enacted the "Tennessee Plan," governing the selection of judges serving on the various Tennessee courts. See Tenn. Code Ann. §§ 17-4-101 to -118 (1994 & Supp. 2006). Section 17-4-101(a) states the purpose and intent of the Tennessee Plan as follows:

> It is the declared purpose and intent of the general assembly by the passage of this chapter to assist the governor in finding and appointing the best qualified persons available for service on the appellate courts of Tennessee, and to assist the electorate of Tennessee to elect the best qualified persons to the courts; to insulate the judges of the courts from political influence and pressure; to improve the administration of justice; to enhance the prestige of and respect for the courts by eliminating the necessity of political activities by appellate justices and judges; and to make the courts "nonpolitical."

In enacting the Tennessee Plan, the General Assembly "established as a part of the judicial branch of the state a judicial selection commission." Tenn. Code Ann. § 17-4-102(a) (1994). The Commission originally was comprised of fifteen individuals who were appointed by the Speaker of the State Senate and the Speaker of the State House of Representatives; in 2001, the General Assembly expanded the Commission to seventeen members. 2001 Tenn. Pub. Acts, ch. 459, § 9 (codified as amended at Tenn. Code Ann. § 17-4-102(a) (Supp. 2006)).

The Tennessee Plan sets out a process for filling vacancies on the various courts, under which the Judicial Selection Commission selects a list of nominees from which the Governor may appoint a new judge. The statutory provisions governing the selection and appointment process are at the heart of this case, and we therefore will review the relevant portions of the statute in greater detail. Section 17-4-109(a)(2) (Supp. 2006) provides:

> If a vacancy occurs during the term of office of a judge of the supreme court, then the judicial selection commission shall, at the earliest practicable date, hold a public meeting in Nashville. However, if an incumbent judge fails to file a written declaration of candidacy as required by § 17-4-114 or § 17-4-115, or if the commission is reliably informed that a vacancy is impending for another reason, then the public meeting may be held prior to actual occurrence of the vacancy.

Pursuant to the foregoing provision, the public announcements of Justice Anderson's and Justice Birch's planned retirements led to the Commission initiating the statutory process for selecting two new justices to fill the vacancies which would occur upon those retirements.

The statute sets out the procedure to be followed by the Commission in fulfilling its role in the selection and appointment process:

> (b) Notice of the time, place and purpose of the meeting shall be given by newspapers, radio news, and television news and by such other means as the commission deems proper.
>
> (c) Any member of the public, both lay and attorney, shall be entitled to attend the meeting and express orally or in writing suggestions of possible nominees and/or such citizen's approval of or objections to any suggested nominee for the judicial vacancy. Any licensed attorney may appear and make a statement, oral or written, in support of such attorney's own nomination.
>
> (d) After one (1) public hearing, the commission may hold such additional private or public meetings as it deems necessary. The commission shall make independent investigation and inquiry to determine the qualifications of possible nominees for the judicial vacancy and shall endeavor to encourage qualified attorneys to accept nomination and agree to serve if appointed to the judicial vacancy.
>
> (e) As soon as practicable and not later than sixty (60) days from receipt of written notice from the governor that a vacancy has occurred, the commission, in public or private meeting, by a majority vote shall select three (3) persons whom the commission deems best qualified and available to fill the vacancy and certify the names of the three (3) persons to the governor as nominees for the judicial vacancy. However, if an incumbent judge fails to file a written declaration of candidacy as required by § 17-4-114 or § 17-4-115, or if the commission is reliably informed that a vacancy is impending for another reason, then the commission may meet, select such persons and certify the names of such nominees to the governor prior to actual receipt of written notice from the governor that a vacancy has occurred.
>
> (f) The judicial selection commission, in compiling its list of nominees for a supreme court position, shall assure that the requirements of art. VI, § 2, of the Tennessee Constitution are satisfied.[2]

Tenn. Code Ann. § 17-4-109 (Supp. 2006).

_____

[2] Article VI, section 2 of the Tennessee Constitution provides, in pertinent part: "The Supreme Court shall consist of five Judges, of whom not more than two shall reside in any one of the grand divisions of the State."

Tennessee Code Annotated section 17-4-109 sets out the Judicial Selection Commission's role and responsibilities in nominating individuals for consideration by the Governor as possible appointees to fill an existing or impending judicial vacancy. Section 17-4-112 sets out the Governor's role and responsibilities in appointing a new judge to fill such a vacancy. Section 17-4-112 provides:

> (a) When a vacancy occurs in the office of an appellate court after September 1, 1994, by death, resignation or otherwise, the governor shall fill the vacancy by appointing one (1) of the three (3) persons nominated by the judicial selection commission, or the governor may require the commission to submit one (1) other panel of three (3) nominees. If the governor rejects the first panel of nominees, the governor shall select one (1) of the nominees in the second panel. If the governor rejects the first panel, the governor shall state in writing for the judicial selection commission the reasons for the rejection of the panel.

> (b) The term of a judge appointed under this section shall expire on August 31 after the next regular August election occurring more than thirty (30) days after the vacancy occurs.

By comparing sections 17-4-109 and 17-4-112, it becomes clear that the Tennessee Plan bifurcates the nomination and appointment processes for filling judicial vacancies. Section 17-4-109 gives the Judicial Selection Commission the sole authority to nominate persons to be considered for appointment to fill a judicial vacancy, while section 17-4-112 gives the Governor the sole authority to choose *which* individual to appoint from those nominees certified to the Governor by the Commission. We also note, importantly, that section 17-4-112(b) limits the term of a judge appointed under the Tennessee Plan, effectively providing that the appointed judge's name must be placed on the ballot in the next biennial election for the voters to decide whether to retain the judge in office. See Tenn. Code Ann. § 17-4-114.

## II. ISSUES RAISED BY J. HOUSTON GORDON

J. Houston Gordon ("Gordon")[3] raises two issues in his brief. First, he asserts that Richard H. Dinkins' withdrawal from consideration for appointment rendered the first panel invalid. As a result, Gordon contends that the Governor's purported "return" or "rejection" of the first panel had no legal effect. He argues that the Commission should have replaced Dinkins' name with the name of another nominee and then should have resubmitted the first panel to the Governor for his consideration. Second, Gordon argues in the alternative that, assuming arguendo that the Governor's rejection of the first list was valid, the Tennessee Plan does not preclude the Commission from including on a second panel the name of a person listed on a first panel of nominees rejected by the Governor. We will address each of these two issues in turn.

---

[3] For ease of reference, we will refer to Mr. Gordon and Mr. Lewis by their respective surnames.

Gordon's first issue is based upon his interpretation of section 17-4-109(e), which provides, in pertinent part: "the commission, in public or private meeting, by a majority vote shall select three (3) persons whom the commission deems best qualified and available to fill the vacancy and certify the names of the three (3) persons to the governor as nominees for the judicial vacancy." Under Gordon's argument, one nominee's withdrawal from consideration for appointment contravenes this statute because the withdrawal results in less than three names certified to the Governor. Accordingly, he argues that the list certified to the Governor by the Commission becomes void upon the withdrawal of one nominee and the list should be returned to the Commission for the addition of a new third nominee.

This issue is one of statutory construction. "When interpreting statutes, this Court must ascertain and give effect to the legislative intent without restricting or expanding the statute's intended meaning or application." Killingsworth, 205 S.W.3d at 408. As we stated in Clark v. Lowe's Home Centers, 201 S.W.3d 647, 649 (Tenn. 2006):

> Intent is determined "from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning." State v. Flemming, 19 S.W.3d 195, 197 (Tenn. 2000). If the statute's language is clear, we must apply its plain meaning without a forced interpretation. Mooney v. Sneed, 30 S.W.3d 304, 306 (Tenn. 2000).

Applying these rules of statutory construction, we must reject Gordon's argument. The Tennessee Plan is completely silent as to the effect of the withdrawal of one nominee certified to the Governor by the Commission. Section 17-4-109(e) requires the Judicial Selection Commission to "select three (3) persons whom the commission deems best qualified and available to fill the vacancy and certify the names of the three (3) persons to the governor as nominees for the judicial vacancy." That is exactly what occurred in this case—on July 18, 2006, the Commission certified by letter to the Governor the names of three nominees for the expected vacancy on this Court: Richard H. Dinkins, J. Houston Gordon, and George T. "Buck" Lewis. Once the Commission certified those three names to the Governor, its role in the selection and appointment process set out in the statute was complete, unless and until the Governor exercised his statutory right to reject the first list of nominees. We conclude that Gordon's proposed construction of section 17-4-109(e) is a "forced interpretation" of the statute. See Clark, 201 S.W.3d at 649.

We also conclude that Gordon's interpretation of section 17-4-109(e) is inconsistent with the overall purpose and intent behind the Tennessee Plan. See Tenn. Code Ann. § 17-4-101(a). If Gordon's interpretation of the statute were to prevail, a troubling element of gamesmanship could be introduced into the judicial appointment process. For example, one nominee who believes that another nominee is about to be appointed by the Governor could preempt that appointment merely by withdrawing his or her name. Thus, the unilateral action of a single individual could derail the statutory process for selecting and appointing a person to fill a judicial vacancy; that individual could both "invalidate" the list of nominees certified by the Commission and interfere with the Governor's

statutory authority to appoint a remaining nominee or to request a second list of nominees. See Tenn. Code Ann. § 17-4-112(a).

There is another practical flaw in Gordon's argument on this issue. In his brief, Gordon asserted that he and Lewis had the "legal right" to be considered for appointment to the Supreme Court and that Dinkins' withdrawal "frustrated" that "right." It is difficult to see how the withdrawal of one of three nominees for appointment could "frustrate" the chances of the two remaining nominees—indeed, the withdrawal of one candidate obviously *increases* the likelihood that one of the two remaining nominees would be appointed. In other words, there was no legal impediment to the Governor appointing either Gordon or Lewis after Dinkins' withdrawal; he simply exercised his statutory authority to reject the first panel and to request that the Commission submit a second panel from which to make the appointment. See Tenn. Code Ann. § 17-4-112(a).

In his second issue, Gordon argues in the alternative that the Tennessee Plan does not preclude the renomination, on a second panel, of a person who was listed on a first panel rejected by the Governor. In summary, he argues that a list or panel of nominees should be viewed as an entity and that a second panel therefore is lawful if it contains at least one different name from the three names on the first list. Thus, under his argument, a second panel of nominees containing the name of one previously rejected nominee plus two new nominees is a *different* panel from the first panel.

We conclude that Gordon's argument is without merit. Section 17-4-112(a) provides that, upon the Commission's certification of a first list of three nominees, "the governor shall fill the vacancy by appointing one (1) of the three persons nominated by the judicial selection commission, or the governor may require the commission to submit one (1) *other* panel of three (3) nominees." (Emphasis added.) The word "other," as used in section 17-4-112(a), must be construed in light of section 17-4-101(a), which states that "[i]t is the declared purpose and intent of the general assembly by the passage of this chapter to *assist* the governor in finding and appointing the best qualified persons available for service on the appellate courts of Tennessee." (Emphasis added.) The Governor's rejection of a first panel of nominees must be understood not only as a rejection of the panel but also as a rejection of each person nominated by the Judicial Selection Commission to be on the panel. Obviously, the Governor would not reject a first panel if he intended to appoint one of the nominees on that panel. Moreover, although the Tennessee Plan charges the Commission with certifying "one (1) other panel of three (3) nominees" for the Governor's consideration, nothing in the statutory scheme expressly allows the Commission to certify a second panel consisting of persons who were already rejected by the Governor. In the absence of specific statutory language, we are unwilling to reach such a conclusion. Accordingly, we conclude that a second ("other") panel selected by the Commission must consist of three *new* nominees and that the Commission exceeded its authority in renominating Gordon on the second panel certified to the Governor.

We hold that Dinkins' withdrawal did not invalidate the first panel, and we also hold that the Judicial Selection Commission erred in renominating Gordon on the second panel certified to the

Governor. Having considered and rejected the arguments made by Gordon, we turn next to consider the issues raised by Lewis.

### III. ISSUES RAISED BY GEORGE T. LEWIS

Lewis contends that the Governor's rejection of Gordon and Lewis, following Dinkins' withdrawal, was impermissibly based solely upon the race of the two remaining nominees. As Lewis states in his brief, "the [Governor's July 24, 2006] letter leads to the inescapable conclusion that solely because Lewis and Gordon are both Caucasian, the Governor rejected the panel." That contention forms the basis for the two issues raised in Lewis's brief. As his first issue, Lewis asserts that the trial court erred in ruling that the Tennessee Human Rights Act does not apply to the Governor's rejection of Gordon and Lewis. As his second issue, Lewis argues that the trial court erred in ruling "that Lewis and Gordon's state and federal constitutional rights to equal protection of the law did not restrict the Governor's discretion to reject a panel of nominees based solely upon the race of the nominees."

We first will address Lewis's claims under the Tennessee Human Rights Act ("THRA"). The THRA is set out in Title 4, Chapter 21 of the Tennessee Code Annotated. Lewis relies upon various portions of the THRA in arguing that the Act applies to the Governor's rejection of Lewis and Gordon on alleged racial grounds. He first cites section 4-21-101, which provides:

(a) It is the purpose and intent of the general assembly by this chapter to:

(1) Provide for execution within Tennessee of the policies embodied in the federal Civil Rights Acts of 1964, 1968 and 1972, the Pregnancy Amendment of 1978, and the Age Discrimination in Employment Act of 1967, as amended;

(2) Assure that Tennessee has appropriate legislation prohibiting discrimination in employment, public accommodations and housing sufficient to justify the deferral of cases by the federal equal employment opportunity commission, the department of housing and urban development, the secretary of labor and the department of justice under those statutes;

(3) Safeguard all individuals within the state from discrimination because of race, creed, color, religion, sex, age or national origin in connection with employment and public accommodations, and because of race, color, creed, religion, sex or national origin in connection with housing;

(4) Protect their interest in personal dignity and freedom from humiliation;

(5) Make available to the state their full productive capacity in employment;

(6) Secure the state against domestic strife and unrest that would menace its democratic institutions;

(7) Preserve the public safety, health and general welfare; and

(8) Further the interest, rights, opportunities and privileges of individuals within the state.

(b) The prohibitions in this chapter against discrimination because of age in connection with employment and public accommodations shall be limited to individuals who are at least forty (40) years of age.

Tenn. Code Ann. § 4-21-101 (2005).

In addition, Lewis relies upon section 4-21-401(a), which states that "[i]t is a discriminatory practice for an employer to" do the following:

(1) Fail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin; or

(2) Limit, segregate or classify an employee or applicants for employment in any way that would deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect the status of an employee, because of race, creed, color, religion, sex, age or national origin.

Lewis argues that the Governor, as agent for the State of Tennessee, is an "employer" for purposes of the THRA. See Tenn. Code Ann. § 4-21-102(4) (2005) (including "the state" in the THRA's definition of "employer"). Similarly, Lewis asserts that he and Gordon, as nominees to fill the judicial vacancy on the Supreme Court, must be considered as "employees" (or, more accurately, as "applicants")[4] covered by the THRA. Lewis therefore contends that the Governor's rejection of Lewis and Gordon, which allegedly was based solely on their race, violated the provisions of the THRA.

The Governor argues in response that the Governor's appointment to fill a vacancy on the Supreme Court of Tennessee is not an employment decision under either federal or state law. For that reason, the Governor contends that the THRA is inapplicable to such appointments.

---

[4] See Tenn. Code Ann. § 4-21-401(a) (2005) ("Employer practices") for provisions applying to applicants for employment. For ease of reference, we will use "employee(s)" in this opinion, rather than "applicant(s)."

The respective briefs filed by Lewis and the Governor each contain detailed and well-reasoned arguments as to whether a nominee for a judicial vacancy is an "employee" for purposes of the THRA (and therefore covered, or not covered, by the Act). Each party compares and contrasts various portions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, with portions of the THRA in support of their respective arguments. The parties also cite pertinent cases—Tennessee and federal cases, as well as cases from other states—on the "employee" issue.

We begin by emphasizing that the question in this case is not whether judges are employed by the State. The question is whether a nominee or applicant[5] to fill a judicial vacancy is an "employee" *for purposes of the THRA*. For the reasons stated below, we answer that question in the negative.

Although the THRA contains a definition of "employer," see Tenn. Code Ann. § 4-21-102(4), the Act does not contain a definition of the word "employee." We observe, however, that section 4-21-101(a)(1) states that one of the primary purposes of the THRA is to "[p]rovide for execution within Tennessee of the policies embodied in the federal Civil Rights Acts of 1964, 1968 and 1972, the Pregnancy Amendment of 1978, and the Age Discrimination in Employment Act of 1967, as amended[.]" As the Tennessee Court of Appeals has stated:

> In light of the intended overlap in purpose between the Tennessee Human Rights Act and federal anti-discrimination laws, Tennessee's courts regularly consult the decisions of their federal counterparts for guidance when called upon to construe and apply the Tennessee Human Rights Act.

Wilson v. Rubin, 104 S.W.3d 39, 48 (Tenn. Ct. App. 2002);[6] see also Lynch v. City of Jellico, 205 S.W.3d 384, 399 (Tenn. 2006) (stating that because "[t]he intent of the THRA is to provide for execution within Tennessee of the policies embodied in the federal civil rights statutes . . . an analysis of claims under the THRA is the same as under Title VII of the Federal Civil Rights Act").

Given that the THRA is generally interpreted consistently with Title VII, we note that the latter defines "employee" as "an individual employed by an employer." 42 U.S.C. § 2000e(f). Although this definition taken alone is rather unhelpful, we find it significant, as did the trial court, that the Title VII definition excludes certain individuals such as elected state officials, personal staff of elected state officials, appointees by elected state officials on the policymaking level, and immediate advisors to elected state officials. Id.

---

[5] We note that Lewis's arguments on this issue theoretically could apply to *applicants* for a judicial vacancy, i.e., persons who apply to the Judicial Selection Commission for consideration, in addition to nominees selected and certified to the Governor by the Commission.

[6] The Court of Appeals, however, correctly observed that "[t]hese federal precedents are, of course, not binding on Tennessee courts and do not limit our ability to give the fullest possible effect to the Tennessee Human Rights Act." Wilson, 104 S.W.3d at 48 n.6.

In any event, we further note that the question of whether an individual is an employee for purposes of Title VII is resolved by applying common law principles of agency.  See Shah v. Deaconess Hosp., 355 F.3d 496, 499 (6th Cir. 2004) (stating, in a case brought under federal discrimination statutes, "we apply the common law agency test to determine whether a hired party is an independent contractor or an employee"); O'Connor v. Davis, 126 F.3d 112, 115 (2d Cir. 1997) (stating, "it is well established that when Congress uses the term 'employee' without defining it with precision, courts should presume that Congress had in mind 'the conventional master-servant relationship as understood by the common-law agency doctrine'"). Cf. Clackamas Gastroenterology Assocs., P.C. v. Wells, 538 U.S. 440, 444-51 (2003) (applying common law principles in determining whether physician-shareholder was an employee for purposes of Americans with Disabilities Act).

The Supreme Court of the United States has summarized the relevant common-law agency principles as follows:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished.  Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.  See Restatement § 220(2) (setting forth a nonexhaustive list of factors relevant to determining whether a hired party is an employee).  No one of these factors is determinative.

Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 751-52 (1989) (footnotes omitted); see also Galloway v. Memphis Drum Serv., 822 S.W.2d 584, 586 (Tenn. 1991) (stating comparable factors for determining whether a work relationship is that of employer-employee or independent contractor for purposes of workers' compensation statutes).

In Thompson v. City of Austin, 979 S.W.2d 676 (Tex. App. 1998), the Texas Court of Appeals considered the issue of whether municipal court judges were employees for purposes of the Texas Commission on Human Rights Act ("TCHRA"), sections 21.001-.405, Texas Labor Code Annotated.  In that case, two municipal court judges had not been reappointed by the city council, and the judges filed suit under the TCHRA, alleging that the city council had not reappointed them because of their respective disabilities.[7]  The Texas court held that the municipal court judges were

---

[7] One judge, due to his disabilities, used a cane and a motor scooter for mobility, and the other judge suffered from multiple sclerosis and trigeminal neuralgia.  Thompson, 979 S.W.2d at 679 nn.1 & 2.

not employees for purposes of the TCHRA.[8] Id. at 682. In reaching that conclusion, the court focused primarily on the fact that the city council lacked any authority to control the "means and manner" of the municipal court judges' performance of their duties. Id.

After considering the common-law factors set out above for determining whether an individual is an employee, we reach the same conclusion that was reached in Thompson—state court judges (and hence nominees to fill a judicial vacancy) are not employees for purposes of the THRA. Most importantly, the Governor (the "hiring party") has no authority to control, in any way, the "manner and means" by which judges perform their official duties. Nor does the Governor (nor any other state officer) have the power to demote or terminate a state court judge. Judges may be removed from office only in limited circumstances, i.e., by the electorate in a retention election, see Tenn. Code Ann. §§ 17-4-114 and 17-4-115, or by constitutional means, see Tenn. Const. art. V, § 4 (providing that "[t]he Governor, Judges of the Supreme Court, Judges of Inferior Courts, [and] Chancellors . . . shall be liable to impeachment, whenever they may, in the opinion of the House of Representatives, commit any crime in their official capacity which may require disqualification") and art. VI, § 6 (providing that "Judges and Attorneys for the State may be removed from office by a concurrent vote of both Houses of the General Assembly").[9] Additionally, none of the other common-law factors quoted above weigh in favor of finding nominees to fill a judicial vacancy to be employees for purposes of the THRA.

Accordingly, we affirm the trial court's ruling that the THRA does not apply to this proceeding. We turn next to consider Lewis's equal protection claims.

In his second issue, Lewis asserts that the Governor's rejection of the first panel violated the equal protection provisions of the Constitution of the United States and the Constitution of the State of Tennessee. He contends that the first panel was rejected solely due to the racial classification of Lewis and Gordon and that the rejection of the first panel is presumptively invalid. Lewis goes on to argue that: (1) this Court must review the rejection of the first panel applying strict scrutiny; (2) the rejection of the first panel was not necessary to achieve a compelling state interest; and (3) the rejection of the first panel was not narrowly tailored to achieve a compelling state interest. Lewis relies primarily upon three decisions of the Supreme Court of the United States, dealing with the extent to which state government may classify applicants on the basis of race in the interest of diversity: Grutter v. Bollinger, 539 U.S. 306 (2003); Gratz v. Bollinger, 539 U.S. 244 (2003); and

---

[8] In Thompson, the court applied the "hybrid 'economic realities-common law control' test" previously applied in Guerrero v. Refugio County, 946 S.W.2d 558, 566 (Tex. App. 1997). That test differs slightly from the common-law agency test discussed earlier, but any differences between the economic realities and common-law agency tests "are minimal." Shah, 355 F.3d at 499. For purposes of our analysis, any such differences are immaterial.

[9] Judges, of course, are subject to the ethics rules set out in Tennessee Supreme Court Rule 8 ("Rules of Professional Conduct") and Tennessee Supreme Court Rule 10 ("Code of Judicial Conduct"). See also Tenn. Code Ann. §§ 17-5-101 to -314 (1994 & Supp. 2006) (establishing the Court of the Judiciary and providing for disciplinary procedures for resolving ethical complaints against judges).

Regents of Univ. of Cal. v. Bakke, 438 U.S. 265 (1978).[10] Lewis asserts that, as stated in his brief: "These decisions considered collectively indicate that race may sometimes be considered as a plus factor along with all of the other individual characteristics of the applicants, but only when there is proof of a compelling state interest and only when there is proof that the racial classification is necessary and is part of a narrowly-tailored policy." Lewis argues that those criteria have not been met in the pending case and that the Governor's rejection of the first panel therefore violated equal protection principles.

The Governor denies that an equal protection violation occurred. He argues that Grutter, Gratz, and Bakke are cases involving the admissions programs of certain public educational institutions, programs that included special provisions aimed at increasing admission of minority applicants. The Governor asserts that the pending case is wholly different from those three cases; this is a case involving the exercise of a governor's discretionary authority, acting pursuant to a statute enacted by the legislature, to appoint members of the judicial branch of state government. The Governor contends that the fundamental issue in this case is whether he may, consistent with the Equal Protection Clause, consider diversity in making appointments to the judiciary under the Tennessee Plan.

In addition, the Governor argues that the Supreme Court of the United States has recognized that cases involving discretionary-appointment challenges require a more circumspect approach. In Mayor of Philadelphia v. Educational Equality League, 415 U.S. 605 (1974), the Supreme Court was presented with an equal protection challenge to Philadelphia's system for appointment of members of the Board of Education, a scheme that parallels the Tennessee Plan. An Educational Nominating Panel (made up partly of appointees by the Mayor) would certify a list of three nominees to the Mayor for appointment to the Board of Education. Id. at 607. The Mayor would then have the option of rejecting the nominees and asking for another list of three nominees. Id. The suit was brought by African-American members of the community alleging that the Mayor violated the Equal Protection Clause by discriminating against African-Americans when appointing members of the Educational Nominating Panel, which in turn, had an adverse disparate impact on the African-American population of the Board of Education. Id. at 608-10. Although the Court decided the case on other grounds, the Court discussed the "delicate issues" presented in equal protection challenges to discretionary appointments by state and local executive officers:

> [T]o the degree that the principles cited by the Mayor reflect concern that judicial oversight of discretionary appointments may interfere with the ability of an elected official to respond to the mandate of his constituency, they are in point. There are also delicate issues of federal-state relationships underlying this case. The federalism questions are made particularly complex by the interplay of the Equal Protection Clause of the Fourteenth Amendment, with its special regard for the status of the

_____

[10] As for his claim under article I, section 8, and article XI, section 8 of the Tennessee Constitution, Lewis cites Gallaher v. Elam, 104 S.W.3d 455 (Tenn. 2003); State v. Whitehead, 43 S.W.3d 921 (Tenn. Crim. App. 2000); State v. Robinson, 29 S.W.3d 476 (Tenn. 2000).

-15-

rights of minority groups and for the role of the Federal Government in protecting those rights. . . . [A]s recently as in <u>Carter v. Jury Comm'n of Greene County</u>, . . . [we] recognized "the problems that would be involved in a federal court's ordering the Governor of a State to exercise his discretion in a particular way . . . ."

<u>Id.</u> at 615 (quoting <u>Carter</u>, 396 U.S. 320, 338 (1970)).  Although the Governor concedes that the federalism issue mentioned in <u>Educational Equality League</u> is not present in the pending case because it has been brought in state, not federal, court, he argues that the "delicate issues" identified in <u>Educational Equality League</u> are "no less significant" in this proceeding.

The Governor goes on to argue in the alternative that even if discretionary executive appointments to fill judicial vacancies are regulated in some fashion by the Equal Protection Clause, the trial court correctly found that the undisputed facts of this case do not make out a prima facie showing that Lewis was discriminated against on account of his race.  Again in the alternative, the Governor contends that, *if* the Court concludes that equal protection analysis must be applied, his actions concerning the rejection of the first panel satisfy the strict-scrutiny test applied in such an analysis.

In considering the parties' arguments, we cannot overlook the doctrine of separation of powers and the related political-question doctrine that in part dictates our resolution of this issue.

Article II, section 1 of the Tennessee Constitution provides: "The powers of the Government shall be divided into three distinct departments: the Legislative, Executive, and Judicial."  Article II, section 2, which is titled "Limitation of powers," provides: "No person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted."  These two constitutional provisions are the cornerstone of the doctrine of separation of powers.  As we previously have stated:

The separation of powers doctrine arises from the precept that "[i]t is essential to the maintenance of republican government that the action of the legislative, judicial, and executive departments should be kept separate and distinct."  <u>Richardson v. Young</u>, 122 Tenn. 471, 492, 125 S.W. 664, 668 (1910).  The Court of Appeals has summarized the doctrine as follows:

In general, the "legislative power" is the authority to make, order, and repeal law; the "executive power" is the authority to administer and enforce the law; and the "judicial power" is the authority to interpret and apply law.  The Tennessee constitutional provision prevents an encroachment by any of the departments upon the powers, functions and prerogatives of the others.  The branches of government, however, are guided by the doctrine of checks and balances; the doctrine of separation of powers is not absolute.

State v. Brackett, 869 S.W.2d 936, 939 (Tenn. Crim. App. 1993) (citations omitted). Thus, while the three branches of government are independent and co-equal, they are to a degree interdependent as well, with the functions of one branch often overlapping that of another. Underwood v. State, 529 S.W.2d 45, 47 (Tenn. 1975).

State v. King, 973 S.W.2d 586, 588 (Tenn. 1998); see also Richardson v. Tenn. Bd. of Dentistry, 913 S.W.2d 446, 453 (Tenn. 1995).

Occasionally a court case involves a particular issue—in this case, an alleged violation of the constitutional guarantee of equal protection under the law—which collides with the constitutional separation of powers. In such cases, the court must consider whether the issue presented is a non-justiciable political question; in rare cases, the court must conclude that the doctrine of separation of powers precludes consideration of the particular issue or claim raised by the party. The political-question doctrine was summarized by the Court of Appeals in Mayhew v. Wilder:

> Article II, Section 2 of our Constitution prohibits a person belonging to one of the three great departments of government from exercising the powers delegated to another department, *except as the Constitution itself directs or permits*. The courts may, of course, hold an act of the Legislature unconstitutional, Town of South Carthage v. Barrett, 840 S.W.2d 895 (Tenn. 1992), and in certain limited cases the courts may provide a remedy where the action (or inaction) of the executive or legislative branches deprive the people of their constitutional rights. In Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the United States Supreme Court held that the Tennessee Legislature's refusal to re-apportion the state's legislative districts violated the equal protection provisions of the United States Constitution. In Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), the same court held that the House of Representatives could not exclude a member who had been duly elected and possessed all the requirements of membership expressly prescribed in the Constitution.
>
> However, these incursions are rare. Where the question presented and the relief sought are of the type that do not admit of judicial resolution, or if the issue presented is a purely "political question," the separation of powers provisions of our constitutions make it non-justiciable. Id. at 516, 517, 89 S.Ct. 1944. In Baker v. Carr [369 U.S. at 217], the court discussed what makes a question non-justiciable:
>
>> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a

court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

46 S.W.3d 760, 773 (Tenn. Ct. App. 2001), perm. appeal denied (Tenn. March 19, 2001), reh'g denied (Tenn. Apr. 30, 2001).

Under the principles stated in Mayhew, we are faced in the pending case with the question of whether the equal protection claim asserted by Lewis is a non-justiciable political question. The first two factors quoted from Baker v. Carr are particularly prominent in this case. First, Lewis's equal protection claim is a challenge to the Governor's appointment to fill the current vacancy on this Court; on the subject of filling vacancies in office, there is a "textually demonstrable constitutional commitment of the issue to a coordinate political department"—the Tennessee Constitution provides that "[t]he election of all officers, and the filling of all vacancies not otherwise directed or provided by this Constitution, shall be made in such manner as the Legislature shall direct." Tenn. Const. art. VII, § 4. Pursuant to this constitutional provision, the General Assembly enacted the Tennessee Plan, setting out the manner in which judicial vacancies are to be filled. Under the Tennessee Plan, the Governor alone is empowered to make appointments to fill such vacancies.

Regarding the second factor from Baker v. Carr ("lack of judicially discoverable and manageable standards for resolving [the issue]"), we note the far-reaching implications of Lewis's equal protection challenge. *If* judicial appointments made pursuant to the Tennessee Plan are subject to equal protection challenges, *every* such appointment could theoretically be the subject of litigation. And although *pre-appointment* equal protection challenges, similar to Lewis's claim in this case, could "merely" forestall the filling of a judicial vacancy, nothing would appear to preclude a *post-appointment* equal protection challenge to judicial appointments. The consequences to the Tennessee judicial system could be chaotic. For example, what remedy would exist after a judge is duly appointed by the Governor? If the judge were retained in office following the statutorily-mandated retention election, what would be the effect on the challenged judge's status? Moreover, Lewis's own suggested remedy for a pre-appointment challenge illustrates the lack of a "manageable standard for resolving the issue"—he asks this Court to order the Governor to fill the current vacancy by appointing either Lewis or Gordon, but assuming arguendo that the reason advanced by the Governor in rejecting Lewis and Gordon violated equal protection principles, Lewis's proposed remedy overlooks the fact that the Governor still would have the statutory prerogative under the Tennessee Plan to ask for a second panel, if he has any additional reason for doing so. It *clearly* would be a violation of the separation-of-powers doctrine for us to preclude the Governor from asking for a second panel for some reason other than the one stated in his letter rejecting the remaining panel of Lewis and Gordon. For these reasons, we conclude that the second factor stated in Baker applies—we conclude that there is "a lack of judicially discoverable and manageable standards for resolving" Lewis's equal protection claim.

Our conclusion that Lewis's equal protection challenge presents a non-justiciable political question does not imply that the Governor's rejection of the two remaining nominees on the first list (Lewis and Gordon) violated equal protection principles. Indeed, we believe that the Governor's actions neither implicated nor ran afoul of equal protection principles.

As a threshold matter, we conclude, as did the trial court, that the unusual circumstances of this case did not make out a prima facie showing that Lewis was discriminated against on the basis of race. As discussed in great detail in this opinion, the Tennessee Plan required the Commission to certify a panel of applicants that were the "best qualified" to fill the Supreme Court vacancy; it did so by certifying the panel consisting of Dinkins, Gordon, and Lewis. The Tennessee Plan then gave the Governor the option of appointing one of the three applicants or requesting a second panel of three applicants. The Governor's July 24 letter reveals that he rejected the first panel presented to him by the Commission because one of the three applicants, Dinkins, voluntarily withdrew from consideration. Indeed, the letter specifically stated: "I have received a letter from Chancellor Richard Dinkins withdrawing his name as one of the three nominees, *and therefore I am requesting pursuant to Tenn. Code Ann. § 17-4-112(a) that the Commission submit a new panel of nominees*."

Notwithstanding, Lewis's claim that he was denied equal protection by virtue of his race hinges solely on the fact that the Governor's letter stated that "diversity is a significant factor that I believe should be considered." In our view, this glimpse into but one of the Governor's considerations must be read in the context of the entire letter, which unequivocally stressed that the Governor's goal was to "appoint judges who meet the highest professional and personal standards." Upon Dinkins' withdrawal, the Governor no longer had a full panel of the "best qualified" applicants from which to exercise his discretion by examining any number of considerations, of which diversity was just one. As a result, the Governor exercised his statutory option to reject the first panel for another panel containing three applicants from which to make the appointment. We will not speculate or otherwise interpret the letter as meaning the Governor would not appoint a white applicant or would only appoint a minority applicant; instead, the Governor, after determining that the first panel was no longer a complete panel with which to evaluate the "best qualified" applicants, took a course of action available to him by statute under the Tennessee plan.

As noted above, the *factual basis* for Lewis's claim resembles none of the cases he has cited in support of his position in which the United States Supreme Court found racial classifications. See Grutter, 539 U.S. 306; Gratz, 539 U.S. 244; and Bakke, 438 U.S. 265. These cases involve the admissions programs of public educational institutions that included provisions for increasing the admission of minority applicants. In contrast, this case involves the exercise of a governor's discretionary authority pursuant to a comprehensive statute enacted by the legislature to appoint members of the judicial branch of state government. See Educ. Equality League, 415 U.S. at 614.

However, even assuming for the purpose of argument that the Governor's July 24 letter constitutes a racial classification, we conclude that there was no equal protection violation. The Supreme Court summarized in Grutter the analytical framework for equal protection cases:

We have held that all racial classifications imposed by government "must be analyzed by a reviewing court under strict scrutiny." This means that such classifications are constitutional only if they are narrowly tailored to further compelling governmental interests. "Absent searching judicial inquiry into the justification for such race-based measures," we have no way to determine what "classifications are 'benign' or 'remedial' and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics." We apply strict scrutiny to all racial classifications to "'smoke out' illegitimate uses of race by assuring that [government] is pursuing a goal important enough to warrant use of a highly suspect tool."

*Strict scrutiny is not "strict in theory, but fatal in fact." Although all governmental uses of race are subject to strict scrutiny, not all are invalidated by it.* As we have explained, "whenever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." But that observation "says nothing about the ultimate validity of any particular law; that determination is the job of the court applying strict scrutiny." When race-based action is necessary to further a compelling governmental interest, such action does not violate the constitutional guarantee of equal protection so long as the narrow-tailoring requirement is also satisfied.

Grutter, 539 U.S. at 326-27 (emphasis added; citations omitted).

In upholding the University of Michigan Law School's written admission policy, which included consideration of class diversity in making admission decisions, the Court found a compelling state interest which supported the use of race as a factor in admissions. Id. at 328. The Court went on to discuss "the educational benefits that diversity is designed to produce" and concluded that those benefits are "substantial." Id. at 330. As the Court stated:

This Court has long recognized that "education . . . is the very foundation of good citizenship." For this reason, the diffusion of knowledge and opportunity through public institutions of higher education must be accessible to all individuals regardless of race or ethnicity. *The United States, as amicus curiae, affirms that "[e]nsuring that public institutions are open and available to all segments of American society, including people of all races and ethnicities, represents a paramount government objective."* And, "[n]owhere is the importance of such openness more acute than in the context of higher education." *Effective participation by members of all racial and ethnic groups in the civic life of our Nation is essential if the dream of one Nation, indivisible, is to be realized.*

Moreover, universities, and in particular, law schools, represent the training ground for a large number of our Nation's leaders. Individuals with law degrees

-20-

occupy roughly half the state governorships, more than half the seats in the United States Senate, and more than a third of the seats in the United States House of Representatives. The pattern is even more striking when it comes to highly selective law schools. A handful of these schools accounts for 25 of the 100 United States Senators, 74 United States Courts of Appeals judges, and nearly 200 of the more than 600 United States District Court judges.

> *In order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity.*

Id. at 331-32 (emphases added; citations omitted).

The general principles stated in the preceding quotation, especially the last sentence, could hardly be improved upon as a statement of the compelling state interest in seeking to have a diverse judiciary. Indeed, the interest in achieving a diverse judiciary, particularly at the state level, has been the subject of numerous studies. See Barbara L. Graham, Toward an Understanding of Judicial Diversity in American Courts, 10 Mich. J. Race & L. 153 (2004); Sherrilyn A. Ifill, Racial Diversity on the Bench: Beyond Role Models and Public Confidence, 57 Wash. & Lee L. Rev. 405 (2000). As one commentator has expressed:

> The case for diversity is especially compelling for the judiciary. It is the business of the courts, after all, to dispense justice fairly and administer the laws equally. It is the branch of government ultimately charged with safeguarding constitutional rights, particularly protecting the rights of vulnerable and disadvantaged minorities against encroachment by the majority. How can the public have confidence and trust in such an institution if it is segregated – if the communities it is supposed to protect are excluded from its ranks?

Edward M. Chen, The Judiciary, Diversity, and Justice for All, 91 Cal. L. Rev. 1109, 1117 (2003) (footnote omitted). Similarly:

> The lack of racial and ethnic diversity at the capstone of the legal profession, the judiciary, is one of the most compelling and contentious issues surrounding judicial selection in the United States. In broad perspective, the lack of judicial diversity overlaps a range of other important issues involving the judicial system: judicial independence, public confidence in the courts, and the commitment to democratic principles of equality and justice.

Graham, Toward an Understanding of Judicial Diversity in American Courts, 10 Mich. J. Race & L. at 153.

Accordingly, we conclude it entirely appropriate for a Governor to *include diversity as a single factor among many other important factors* which he or she considers in making judicial appointments, e.g., educational background, professional experience, likely judicial temperament, professional and civic activities, etc. Interestingly, Lewis appears to concede that the Governor could have permissibly considered race in choosing an appointee from the original list of three nominees: Dinkins (assuming he had not withdrawn), Gordon and Lewis. As Lewis states in his brief:

> The issue, of course, is not whether the Governor could have permissibly considered race as a factor along with other individual characteristics in making his appointment had Chancellor Dinkins not withdrawn. Likewise, the issue is not whether the Governor could have permissibly considered race as a factor along with other individual characteristics when appointing from a second panel. The issue is the rejection, not the appointment. Lewis and Gordon had the right to be considered as individuals based upon their individual characteristics. They had the right to be judged upon characteristics other than their race. In other words, *race may have been one factor which the Governor would have used to decide who to appoint, but race was the exclusive reason for his decision to reject the first panel*.

(Emphasis added.) As discussed above, we disagree that race was the exclusive reason for the Governor's action. Moreover, Lewis's purported distinction between considering race in appointing but not in rejecting nominees is a distinction without a difference. In appointing one individual from among three, the Governor necessarily would be rejecting two nominees.

The next step in an equal protection analysis would be to consider whether the means chosen to accomplish the government's asserted purpose is "'specifically and narrowly framed to accomplish that purpose.'" Grutter, 539 U.S. at 333 (quoting Shaw v. Hunt, 517 U.S. 899, 908 (1996)). Once Chancellor Dinkins withdrew from consideration for appointment to this Court, Tennessee Code Annotated section 17-4-112(a) gave the Governor only one option to allow him to consider diversity (among other factors) in making his appointment—that option was to reject the two remaining nominees on the first panel and to request a second panel (asking the Judicial Selection Commission to include qualified minority candidates). Accordingly, the Governor's action was narrowly tailored to accomplish the purpose of considering diversity in making judicial appointments.[11]

In summary, we hold that: (1) the THRA does not apply to this case, (2) Lewis's equal protection challenge to the Governor's actions presents a non-justiciable political question, and (3)

---

[11] In reaching our conclusions, we have discussed numerous cases involving equal protection principles under the United States Constitution. We emphasize, however, that the decision we reach today is based not only on the Fourteenth Amendment to the United States Constitution but also on independent grounds under article I, section 8 of the Tennessee Constitution. See State v. Howell, 868 S.W.2d 238, 259 n.7 (Tenn. 1993).

Lewis's equal protection challenge is otherwise without merit. Having considered and rejected Lewis's arguments, we turn next to consider the issues raised by the Judicial Selection Commission.

## IV. ISSUES RAISED BY JUDICIAL SELECTION COMMISSION

In its first issue, the Judicial Selection Commission joins Lewis in arguing that the trial court erred in ruling that the Tennessee Human Rights Act does not apply to the Governor when appointing individuals to fill judicial vacancies. For the reasons stated above in our analysis of Lewis's issues, we affirm the trial court's ruling that the THRA does not apply in this case.

In its second issue, the Commission argues that the Governor's letter dated July 24, 2006, in which he requested that the Commission send him "a new panel of nominees that includes qualified minority candidates," encroached on the powers assigned to the Commission by the Tennessee Plan. The Commission asserts that the Governor's letter amounted to an instruction to the Commission that the second panel contain one or more minority nominees and that such an instruction invades the authority of the Commission to determine the "best qualified persons available for service." See Tenn. Code Ann. § 17-4-101(a). The trial court rejected this argument, concluding that the disputed portion of the Governor's letter was "clearly a request" and that the letter "does not rise to the level of an executive directive or order."

We agree with the trial court's characterization of the Governor's letter as a "request," rather than an "executive directive or order." Therefore, we conclude that the Governor's letter did not impermissibly encroach upon the Commission's powers.

In its third issue, the Commission asserts that the trial court erred in its determination of the appropriate remedy. Based upon its resolution of the various issues raised by the parties, the trial court ordered the Commission to certify and submit to the Governor a second panel of nominees, which panel could not include the names of Gordon or Lewis. The trial court went further, however, and provided that:

> 3.   The Commission shall not open the matter to new applicants or convene additional public hearings, but shall minimize the time and expense and draw upon the work they [sic] have already done by considering the applications of the pool already collected.
>
> 4.   From that pool, the Commission shall select a third nominee to add to and complete the second panel already comprised of Judge D'Army Bailey and Judge William Koch.

The Commission argues that the remedy imposed by the trial court went too far and "unduly restricts the manner in which the Commission is to perform its statutory duties." The Commission goes on to assert in its brief:

As a result of the Governor's actions and the Chancellor's ruling in this case, the landscape has changed. Therefore, the Commission respectfully requests that the Court (1) reverse the part of the Chancellor's Order restricting the selection of the third name to the current pool of applicants, and (2) allow the Commission the discretion as to how it will proceed to pick the third nominee.

Among the trial judge's stated reasons for the limited scope of the remedy was the importance of filling, as soon as practicable, the existing vacancy on this Court.[12] While we commend the trial judge for her concern about the vacancy's impact on this Court and on Tennessee's judicial system, we agree with the Commission that the remedy ordered by the trial court unduly restricts the Commission's authority under the Tennessee Plan. As stated in the Commission's brief, "[o]ther than setting out some general rules to guide the Commission's work, Tenn. Code Ann. § 17-4-109, the Tennessee Plan leaves the basic operating procedures to Commission's discretion."

Section 17-4-109(e) provides that the Commission "by a majority vote shall select three (3) persons whom the commission deems best qualified and available to fill the vacancy and certify the names of the three (3) persons to the governor as nominees for the judicial vacancy." Because an ineligible nominee (Gordon) was included on the second panel certified to the Governor, the statutory requirement that the Commission certify "the names of three persons" was never satisfied; under those circumstances, the panel was void ab initio, and the Commission must reinstitute the selection process for all three nominees to be included on the second panel.[13]

Even if we were to conclude that the panel was not void ab initio, there is another reason why the Commission must reinstitute the selection process for the second panel. The Commission argues in part that the trial court erred in limiting the Commission's discretion to accept additional applications for the second panel. We note again that the Commission has the statutory duty to "select three (3) persons whom the commission deems best qualified and available to fill the vacancy." Tenn. Code Ann. § 17-4-109(e). It logically follows from the statute that, in order to make an informed judgment as to which applicants are the three persons "best qualified and available," the Commission necessarily must compare each applicant with *all* of the other applicants who seek to fill the judicial vacancy. Consequently, it would contradict the intent of the statute if the Commission were to select one nominee from a group of applicants that differs, either in whole or in part, from the group of applicants from which the other two nominees were selected. The Commission therefore must consider together, *in a single group*, all applicants to fill the judicial vacancy.

---

[12] At the time of oral argument of this case, this Court had been without a fifth justice for just over five months.

[13] This conclusion does not affect our holding that the withdrawal of a nominee previously certified to the Governor does not affect the validity of the panel. The inclusion of an ineligible nominee on a list certified to the Governor is decidedly different than the certification of a list of three eligible nominees and the subsequent withdrawal of one of those nominees. In the former case, the panel is void ab initio; in the latter case, the withdrawal of a nominee from a valid panel does not instantly render the panel invalid.

For the foregoing reasons, we hold that the Commission is required to re-institute the selection process for all three of the nominees to be certified to the Governor as the second panel. Accordingly, we modify the trial court's judgment by overruling the remedy ordered by that court.

As required by section 17-4-112(a), the Commission shall select and certify to the Governor a second panel of three nominees to fill the judicial vacancy on this Court. Although we encourage the Commission to act expeditiously, we leave to its discretion the manner in which it will select and certify the three nominees. We note, for the Commission's guidance, however, that it may, but is not required to, do any of the following: (1) consider all of the applications previously submitted for the second panel;[14] (2) accept additional applications for consideration; or (3) hold additional hearings as part of the selection process. Upon concluding the process adopted by the Commission, the Commission shall select and certify to the Governor three nominees to fill the judicial vacancy.[15]

## CONCLUSION

For the reasons set out above, we affirm, as modified, the judgment of the trial court. The Appellate Court Clerk is hereby ordered to issue mandate immediately upon the filing of this opinion. Tenn. R. App. P. 42. The costs are taxed to the appellants, J. Houston Gordon and George T. Lewis, for which execution may issue, if necessary.

_____
WILLIAM M. BARKER, CHIEF JUSTICE

---

[14] Those applications would include the applications of Judges Koch and Bailey, among the other applications previously submitted.

[15] Consistent with our holding vis a vis Gordon's erroneous inclusion on the previous second panel certified to the Governor by the Commission, neither Gordon nor Lewis would be eligible for nomination on the new second panel.