FILED
04/18/2024
Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
November 7, 2023 Session

## PARENTS' CHOICE TENNESSEE ET AL. v. JASON GOLDEN, IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF WILLIAMSON COUNTY SCHOOLS ET AL.

**Appeal from the Chancery Court for Williamson County**
**No. 22CV-51642      Michael Binkley, Judge**

_____

**No. M2022-01719-COA-R3-CV**

_____

Parents, on behalf of their children who are public school students, and an education-focused parents' rights organization brought suit against the Williamson County Board of Education, arguing that the Board's adoption and implementation of a particular curriculum violates Tennessee law. The Plaintiffs argue the curriculum violates a state law restricting the use of Common Core textbooks and instructional materials in public schools and violates another state law that bars the teaching of certain prohibited concepts in public schools. The School Board moved to dismiss. The trial court granted the motion on two justiciability grounds. The trial court concluded that the parents and the parents' rights organization lacked standing to maintain either claim. The trial court also concluded that the Plaintiffs were required to exhaust administrative remedies with regard to their prohibited concepts claim and had not done so. The Plaintiffs appealed. With the exception of a family that left the county public school system and has not expressed in their pleadings an intent to return, we conclude that trial court erred in finding the Plaintiffs lacked standing. We affirm the trial court's dismissal of the prohibited concepts claim for failure to exhaust administrative remedies. We reverse, however, the dismissal of the Plaintiffs' Common Core claim and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Reversed in Part; Case Remanded**

JEFFREY USMAN, J., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Larry L. Crain and Emily Castro, Brentwood, Tennessee, for the appellants, Jennifer Doe, J.L., P.J.L., Parents' Choice Tennessee, and Katherine Roe.

1

Lisa M. Carson, Franklin, Tennessee, for the appellee, the Williamson County Board of Education.

## OPINION

### I.

In 2020, the Williamson County Board of Education adopted the Wit & Wisdom curriculum for Williamson County public schools. This curriculum was implemented by principals and teachers in Williamson County public schools. In July 2022, P.J.L. and J.L., who are the parents of a minor child, and the organization Parents' Choice Tennessee[1] filed suit. They brought suit against Jason Golden, in his official capacity as Superintendent of Williamson County Schools, Dave Allen, in his official capacity as Assistant Superintendent of Teaching Assessment, the Williamson County Board of Education (the "School Board"), and Penny Schwinn, in her official capacity as Commissioner of Education. An Amended Complaint was filed September 2022. The Amended Complaint added as Plaintiffs C.L., who is the minor child of P.J.L. and J.L., Jennifer Doe and her minor children A.B. and B.B., and Katherine Roe and her minor children C.D. and D.D. The Parents (P.J.L., J.L., Jennifer Doe, and Katherine Roe) brought claims on behalf of their respective children.

In their Amended Complaint, the Plaintiffs (the Parents on behalf of their children and Parents' Choice) did not seek monetary damages but instead sought declaratory and injunctive relief. The Plaintiffs essentially asserted four violations of law. One, the Plaintiffs asserted that the adoption and implementation of the Wit & Wisdom curriculum violated Tennessee Code Annotated section 49-6-1019,[2] which prohibits the teaching of

---

[1] According to the Plaintiffs' Amended Complaint,

Plaintiff, Parents' Choice Tennessee ("Parents' Choice"), is a member advocacy organization, and an incorporated nonprofit corporation based in Franklin, Tennessee. It is comprised of over 1,400 parents, grandparents and stakeholders who reside throughout Williamson County, the State of Tennessee and the nation. Parents' Choice was organized and incorporated for the express purpose of representing and protecting the parents of Williamson County schoolchildren of all ages in grades kindergarten – 12th grade and their children from harmful, unlawful and age-inappropriate content. Parents' Choice was founded, in large part, to advocate on behalf of Williamson County parents in response to the WCBOE's adoption and implementation of *Wit & Wisdom*. Its goal is to advocate on behalf of its members for wholesome values honored in schools; to foster parental input in what is being taught to their members' children; and to intervene on behalf of its members to advocate for parental rights to safeguard and protect children from harmful and unlawful content in childhood learning curriculum.

[2] Tenn. Code Ann. section 49-6-1019 provides as follows:

2

certain concepts in Tennessee public schools ("Prohibited Concepts Claim"). Two, the Plaintiffs also asserted that adoption and implementation of the Wit & Wisdom curriculum

(a) An LEA or public charter school shall not include or promote the following concepts as part of a course of instruction or in a curriculum or instructional program, or allow teachers or other employees of the LEA or public charter school to use supplemental instructional materials that include or promote the following concepts:
(1) One (1) race or sex is inherently superior to another race or sex;
(2) An individual, by virtue of the individual's race or sex, is inherently privileged, racist, sexist, or oppressive, whether consciously or subconsciously;
(3) An individual should be discriminated against or receive adverse treatment because of the individual's race or sex;
(4) An individual's moral character is determined by the individual's race or sex;
(5) An individual, by virtue of the individual's race or sex, bears responsibility for actions committed in the past by other members of the same race or sex;
(6) An individual should feel discomfort, guilt, anguish, or another form of psychological distress solely because of the individual's race or sex;
(7) A meritocracy is inherently racist or sexist, or designed by a particular race or sex to oppress members of another race or sex;
(8) This state or the United States is fundamentally or irredeemably racist or sexist;
(9) Promoting or advocating the violent overthrow of the United States government;
(10) Promoting division between, or resentment of, a race, sex, religion, creed, nonviolent political affiliation, social class, or class of people;
(11) Ascribing character traits, values, moral or ethical codes, privileges, or beliefs to a race or sex, or to an individual because of the individual's race or sex;
(12) The rule of law does not exist, but instead is a series of power relationships and struggles among racial or other groups;
(13) All Americans are not created equal and are not endowed by their Creator with certain unalienable rights, including, life, liberty, and the pursuit of happiness; or
(14) Governments should deny to any person within the government's jurisdiction the equal protection of the law.

(b) Notwithstanding subsection (a), this section does not prohibit an LEA or public charter school from including, as part of a course of instruction or in a curriculum or instructional program, or from allowing teachers or other employees of the LEA or public charter school to use supplemental instructional materials that include:
(1) The history of an ethnic group, as described in textbooks and instructional materials adopted in accordance with part 22 of this chapter;
(2) The impartial discussion of controversial aspects of history;
(3) The impartial instruction on the historical oppression of a particular group of people based on race, ethnicity, class, nationality, religion, or geographic region; or
(4) Historical documents relevant to subdivisions (b)(1)-(3) that are permitted under § 49-6-1011.

(c) If the commissioner of education finds that an LEA or public charter school knowingly violated this section, then the commissioner shall withhold state funds, in an amount determined by the commissioner, from the LEA or public charter school until the LEA or public charter school provides evidence to the commissioner that the LEA or public charter school is no longer in violation of this section.

violated the Parents' substantive due process rights to control the upbringing of their children in violation of the Fourteenth Amendment to the United States Constitution ("Constitutional Claim"). Three, the Plaintiffs asserted that through the implementation of the Wit & Wisdom curriculum that the School Board violated the prohibition under Tennessee Code Annotated section 49-6-2206(b)(2)(A)[3] on the use of Common Core textbooks and materials ("Common Core Claim"). Four, the Plaintiffs alleged that Commissioner Schwinn violated Tennessee Code Annotated section 49-6-2202(b)(5)[4] by placing Wit & Wisdom, which allegedly is a Common Core curriculum, on the approved list ("Approval List Claim").

In their 187-page Amended Complaint, the Plaintiffs examine multiple texts and materials utilized in Williamson County public schools as part of the Wit & Wisdom curriculum. The Plaintiffs address what they assert are the philosophies and goals underlying the curriculum, including asserting that the curriculum teaches critical race theory. The Plaintiffs in their Amended Complaint address how the adoption and implementation of the Wit & Wisdom curriculum adversely impacted the minor children C.L., A.B., B.B., C.D., and D.D. For example, the Plaintiffs asserted that the curriculum caused psychological injuries to the children including anxiety, stress, and race-based guilt. For the latter, the Plaintiffs allege that the curriculum is designed to foster a sense of guilt based upon past actions of other persons who are of the same race. The Plaintiffs contend that the curriculum succeeded in achieving this aim. The Plaintiffs also asserted the curriculum fostered, in violation of Tennessee law, certain values that were contrary to those they endeavor to instill in their children; for example, they allege that the curriculum taught children to judge persons based upon the color of their skin. The Plaintiffs also alleged educational harms in terms of learning regression and lack of educational advancement. For example, some of the children allegedly experienced a diminishment in

---

[3] Tennessee Code Annotated section 49-6-2206(b)(2)(A) provides as follows:

A teacher or principal in a public school of this state shall not use or permit to be used in the person's school, whether as a supplement to the LEA's or school's adopted textbooks and instructional materials or otherwise, textbooks or instructional materials created to align exclusively with the Common Core State Standards or that are marketed as Common Core textbooks or materials.

[4] Tennessee Code Annotated section 49-6-2202(b)(5) provides as follows:

The commission shall not publish a list of, or recommend that the state board of education approve for use in the public schools of this state, textbooks or instructional materials created to align exclusively with the Common Core State Standards or that are marketed as Common Core textbooks or materials. The state board shall not approve for use in the public schools of this state textbooks or instructional materials created to align exclusively with the Common Core State Standards or that are marketed as Common Core textbooks or materials.

reading skills in response to the curriculum. The Plaintiffs' Amended Complaint addresses how particular texts and materials impacted particular children and caused these injuries.

Within a day of filing their extensive Amended Complaint in September 2022, the Plaintiffs non-suited their claims against Commissioner Schwinn. Later that same month, the remaining Defendants, which included Messrs. Golden and Allen and the School Board, filed a motion to dismiss the Plaintiffs' suit. The Defendants advanced multiple arguments in support of dismissal. One, the Defendants argued that the Plaintiffs lacked standing to bring suit; therefore, the case was non-justiciable. Two, the Defendants argued that the Plaintiffs' suit raised a political question; therefore, the case was non-justiciable. Three, with regard to the Prohibited Concepts Claim, the Defendants argued that the Plaintiffs were required to exhaust administrative remedies and that they had failed to do so. Therefore, they argued, the Prohibited Concepts Claim was non-justiciable. Four, the Defendants argued that neither Tennessee Code Annotated section 49-6-1019 nor Tennessee Code Annotated section 49-6-2206(b)(2)(A), which were the statutory bases for the Plaintiffs' Prohibited Concepts Claim and Common Core Claim respectively, provide a private right of action. Therefore, the Plaintiffs could not maintain their suit which was predicated upon a violation of these statutes by the School Board. Five, the Defendants argued that the Plaintiffs' Constitutional Claim failed because no constitutional right had been violated. Six, the Defendants noted that the Approval List Claim only applied to Commissioner Schwinn and that she had been voluntarily dismissed by the Plaintiffs from the suit. Because the Approval List Claim was neither stated against nor applicable to the remaining Defendants, they sought dismissal. Seven, the Defendants argued that the naming of Messrs. Golden and Allen in their official capacities was redundant because suit was already being brought against the School Board. Accordingly, the Defendants argued that any claims against Messrs. Golden and Allen should be dismissed.

In November 2022, the Plaintiffs non-suited their claims against Messrs. Golden and Allen. This left the School Board as the only remaining defendant. The Plaintiffs also filed a response in opposition to the Motion to Dismiss. Therein, they did not dispute that the Approval List Claim was only filed against Commissioner Schwinn and had been effectively dismissed as a result of non-suiting their claim against Commissioner Schwinn. The Plaintiffs did, however, argue in support of all of their remaining claims against the School Board including their Prohibited Topics Claim, Constitutional Claim, and Common Core Claim.

In December 2022, the trial court issued its Memorandum and Opinion, granting the School Board's motion to dismiss based upon the Plaintiffs' case being non-justiciable. In reaching this conclusion, the trial court addressed two justiciability issues. One, the trial court concluded that the Plaintiffs lacked standing. Specifically, the trial court determined that the Parents lacked standing because their children had not suffered any injuries distinct from any other child in the Williamson County public schools. Because its members, the Parents, lacked standing, the trial court concluded that Parents' Choice did not have

organizational standing. Two, the trial court also addressed exhaustion of administrative remedies. The trial court noted that the School Board had argued in relation to the Plaintiffs' Prohibited Concepts Claim that the Plaintiffs were required to exhaust their administrative remedies. The trial court agreed with the argument. While only substantively addressing the Prohibited Concepts Claim, the trial court, however, stated in its decision that "[b]ecause these procedures were not exhausted prior to filing suit, as an alternate ruling, the Court also DISMISSES the case on this ground."

The Plaintiffs appealed the dismissal of their suit. They reference three of their claims in their briefing on appeal, their Prohibited Concepts Claim, the Common Core Claim, and the Constitutional Claim. They do not address their Approval List Claim, which has been waived. On appeal, the Plaintiffs argue that their case is justiciable, and the trial court erred in concluding to the contrary. The Plaintiffs argue that the Parents have standing to maintain an action on behalf of their children, who they contend suffered distinct and palpable injuries. Because the Parents have standing, the Plaintiffs contend that Parents' Choice has organizational standing. The Plaintiffs also argue that the exhaustion requirement is not mandatory as to the Parents and that requiring them to exhaust would be futile. In addition to defending the bases of the trial court's grant of dismissal, standing and exhaustion of administrative remedies, the School Board also renews its argument on appeal as to three issues that were not ruled upon by the trial court. One, the School Board argues that the case is non-justiciable under the political question doctrine. Two, the School Board asserts that there is no private right of action to pursue either the Plaintiffs' Prohibited Concepts Claim or Common Core Claim. Three, addressing the Plaintiffs' Constitutional Claim, the School Board contends that the Plaintiffs have not actually asserted a claim for a violation of a constitutional right.

II.

Before turning our attention to the Plaintiffs' Prohibited Concepts Claim and Common Core Claim, which are the focus of the appeal in this case, we briefly touch upon the Plaintiffs' Constitutional Claim. The Plaintiffs alleged in their Amended Complaint that the School Board's adoption and use of the Wit & Wisdom curriculum violated the Fourteenth Amendment of the United States Constitution. The School Board argues that the Plaintiffs have not actually asserted a claim for a violation of constitutional rights. The Plaintiffs address this issue in their briefing on appeal. In doing so, however, the Plaintiffs' arguments appear to only actually advance a contention that the School Board violated statutory provisions under the Tennessee Code, rather than alleging an actual constitutional violation by the School Board.

Attempting to understand the Plaintiffs' Due Process claim and their contention that the trial court's dismissal thereof was in error, members of the court asked multiple questions during the oral argument of this case in November 2023 related to the Constitutional Claim in the Plaintiffs' Amended Complaint. In responding to these

questions, the Plaintiffs' waived their Due Process Claim.[5]   Accordingly, we treat the Constitutional Claim in the Plaintiffs' Amended Complaint as having been waived.

III.

Turning to the Plaintiffs' remaining claims, the Prohibited Concepts Claim and Common Core Claim, the parties contest justiciability in their briefing, dueling over standing, the political question doctrine, and exhaustion of administrative remedies.  *See Norma Faye Pyles Lynch Fam. Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 203 (Tenn. 2009) (listing Tennessee's justiciability doctrines as "(1) the prohibition against advisory opinions, (2) standing, (3) ripeness, (4) mootness, (5) the political question doctrine, and (6) exhaustion of administrative remedies" (footnotes omitted)); *see also West v. Schofield*, 468 S.W.3d 482, 490 (Tenn. 2015) (setting forth the same list).

Addressing the basis under the Tennessee Constitution for justiciability limitations on the authority of state courts, the Tennessee Supreme Court has observed the following:

> The Constitution of Tennessee does not expressly define the powers of the Legislative, Executive, or Judicial Branches of government.  *Richardson v. Young*, 122 Tenn. 471, 493, 125 S.W. 664, 668 (1909).  Thus, while Article III, Section 2 of the United States Constitution confines the jurisdiction of the federal courts to "cases" and "controversies," the Constitution of Tennessee contains no such direct, express limitation on Tennessee's courts'

---

[5] Judge's Question:  I am trying to understand the separation between your statutory argument and your Due Process argument.  If I am following your Due Process argument correctly, . . . you are not claiming a right to be able to control what the school system teaches independently of the statute.  You are saying the statute is what imposes the limitation.  If that is your Due Process argument though, how does the Due Process argument exist separately from the statutory argument?  I mean isn't it just it is a Due Process violation because it violates the statute?  That seems to be what you are asserting.  I am struggling to follow.

Counsel: Basically, what we are asking is that the court enforce the laws that our legislature has made which the laws have been made to say you cannot teach certain concepts.

Judge's Question:  So this is about vindicating the statute?

Counsel: Yes.  We are saying -- we are simply asking for the court to enforce the statute.  [Counsel then discussed the statutory measures that the Plaintiffs argue were violated].  All we are asking is that these laws be followed, and they are not.  And so that is where I would say we are going with this lawsuit.

Judge's Question: You are not asserting, though, an independent substantive due process violation?

Counsel: No.

exercise of their judicial power. U.S. Const. art. III, § 2; Tenn. Const. art. I, §§ 1-2; *Miller v. Miller*, 149 Tenn. 463, 484, 261 S.W. 965, 971 (1924) (noting that the Constitution of Tennessee does not contain limitations similar to those in Article III, Section 2).

Despite the absence of express constitutional limitations on the exercise of their judicial power, Tennessee's courts have, since the earliest days of statehood, recognized and followed self-imposed rules to promote judicial restraint and to provide criteria for determining whether the courts should hear and decide a particular case. These rules, commonly referred to as justiciability doctrines, are based on the judiciary's understanding of the intrinsic role of judicial power, as well as its respect for the separation of powers doctrine in Article II, Sections 1 and 2 of the Constitution of Tennessee.

Tennessee's courts believed that "the province of a court is to decide, not advise, and to settle rights, not to give abstract opinions." *State v. Wilson*, 70 Tenn. 204, 210 (1879); *see also Gilreath v. Gilliland*, 95 Tenn. 383, 385-86, 32 S.W. 250, 251 (1895); *Prichitt v. Kirkman*, 2 Tenn. Ch. 390, 393 (1875). Accordingly, they limited their role to deciding "legal controversies." *White v. Kelton*, 144 Tenn. 327, 335, 232 S.W. 668, 670 (1921). A proceeding qualifies as a "legal controversy" when the disputed issue is real and existing, *see State ex rel. Lewis v. State*, 208 Tenn. 534, 536-37, 347 S.W.2d 47, 48 (1961), and not theoretical or abstract, *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 192 (Tenn. 2000); *Miller v. Miller*, 149 Tenn. at 474, 261 S.W. at 968; *State ex rel. Lewis v. State*, 208 Tenn. at 538, 347 S.W.2d at 48-49, and when the dispute is between parties with real and adverse interests. *Memphis Publ'g Co. v. City of Memphis*, 513 S.W.2d 511, 512 (Tenn. 1974).

*Norma Faye Pyles Lynch Fam. Purpose LLC*, 301 S.W.3d at 202-03.

Tennessee's justiciability doctrines have borrowed from, but are not controlled by, federal precedent. "Despite the differences between the state and federal constitutions, Tennessee courts have consistently found federal precedents to be helpful in addressing issues of justiciability and have adopted many of the significant components of federal jurisprudence." *Norma Faye Pyles Lynch Fam. Purpose LLC*, 301 S.W.3d at 203 n.3. However,

[w]hile federal precedent has been helpful in addressing questions of justiciability, Tennessee courts are not bound by this precedent, and the entirety of the doctrines as applied by federal courts has never been adopted wholesale into Tennessee law root and branch. To the contrary, the Tennessee

8

Supreme Court has, more than once, interpreted the Tennessee Constitution in a manner that varies from the federal courts' interpretation of justiciability doctrines under Article III of the United States Constitution.

*Rutan-Ram v. Tennessee Dep't of Children's Servs.*, No. M-2022-00998-COA-R3-CV, 2023 WL 5441029, at *6 n.6 (Tenn. Ct. App. Aug. 24, 2023). With this understanding in mind, we turn our attention below to each of the justiciability doctrines at issue in the present case, addressing standing, the political question doctrine, and the exhaustion of administrative remedies.

A.

The primary basis for the trial court's dismissal of the Plaintiffs' case is the Parents' lack of standing, which it concluded rendered the case non-justiciable. As a result of its conclusion that the Parents did not have standing, the trial court also determined that Parents' Choice lacked organizational standing because its members, the Parents, lacked standing. The trial court explained its conclusions regarding standing as follows:

> In the present case, Parent Plaintiffs are not able to show a distinct and palpable injury. Plaintiffs have no distinct injury different from any other Williamson County School parent, and they cannot show their children have any distinct injury different from any other Williamson County School student. The same curriculum is taught to all students in the same grade level. The injury is not particularized to the level of a distinct injury with respect to standing with respect to Parent Plaintiffs. The same is true for Parent[s'] Choice. Parent[s'] Choice would have organizational standing if its members were deemed to have standing, but Parent[s'] Choice would not have standing on its own. Because Parent Plaintiffs do not have standing, Parent[s'] Choice also does not have standing. Accordingly, because none of Plaintiffs have standing, this case is to be DISMISSED.

The Plaintiffs contend the trial court erred. They assert the Parents' children have suffered distinct and palpable injuries and that therefore, the Parents have standing to maintain suit on behalf of their children. Furthermore, because the trial court's reason for finding no organizational standing for Parents' Choice was predicated upon the Parents' lack of standing, the Plaintiffs assert that the trial court also erred with regard to finding no organizational standing for Parents' Choice. The School Board argues in support of the trial court's conclusions as to the lack of standing as to both the Parents and Parents' Choice.

Tennessee appellate courts review a trial court's ruling on a motion to dismiss for lack of standing "de novo with no presumption of correctness." *Metro. Gov't of Nashville & Davidson Cnty. v. Tenn. Dep't of Educ.*, 645 S.W.3d 141, 147 (Tenn. 2022). When

reviewing a ruling upon a motion to dismiss, Tennessee courts are generally "required to take the relevant and material factual allegations in the complaint as true." *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 894 (Tenn. 2011). Furthermore, courts are to liberally construe the complaint in favor of the plaintiff. *Leach v. Taylor*, 124 S.W.3d 87, 92 (Tenn. 2004). This framework "is equally true with respect to factual allegations regarding standing." *Metro. Gov't of Nashville & Davidson Cnty. v. Tenn. Dep't of Educ.*, 645 S.W.3d at 147-48. Additionally, the Tennessee Supreme Court has indicated that when considering a challenge based upon standing that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Id*. at 148 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

For conventional constitutional standing in Tennessee courts, a plaintiff must establish three elements:

> 1) a distinct and palpable injury; that is, an injury that is not conjectural, hypothetical, or predicated upon an interest that a litigant shares in common with the general public; 2) a causal connection between the alleged injury and the challenged conduct; and 3) the injury must be capable of being redressed by a favorable decision of the court.

*Fisher v. Hargett*, 604 S.W.3d 381, 396 (Tenn. 2020).[6] The question of whether the Parents have standing in the present case turns upon the adequacy of the allegation of injury to their children. There is no question in the present case that if the injury is sufficient, the allegations of causation and redressability connected therewith are also sufficient.

To determine whether the Plaintiffs have standing to bring this case, we must examine the particular allegations of their complaint and evaluate whether they are entitled to adjudicate their claims. *Id*.; *Howe v. Haslam*, No. M2013-01790-COA-R3-CV, 2014 WL 5698877, at *6 (Tenn. Ct. App. Nov. 4, 2014) (citing *Petty v. Daimler/Chrysler Corp.*, 91 S.W.3d 765, 768 (Tenn. Ct. App. 2002)). The question of whether a party has standing should not be confused with the merits of the claim; accordingly, a weak claim does not equate to a lack of standing. *Metro. Gov't of Nashville & Davidson Cnty. v. Tenn. Dep't of Educ.*, 645 S.W.3d at 148-49. Tennessee courts' standing analysis is instead directed towards determining "'whether a party has a sufficiently personal stake in a matter at issue to warrant a judicial resolution of the dispute,'" barring those whose rights or interests have not been affected from bringing suit. *Metro. Gov't of Nashville v. Bd. of Zoning Appeals*

---

[6] The Tennessee Constitution confers significantly greater leeway to taxpayers to maintain an action in Tennessee state courts based upon challenging illegal expenditures of governmental funds than is permitted to taxpayers seeking to invoke the jurisdiction of the federal courts under the United Constitution. *See generally Rutan-Ram*, 2023 WL at *17-21. The Plaintiffs in the present case do not assert that they followed the proper procedure for invoking taxpayer standing or that they satisfy the standards thereof.

*of Nashville*, 477 S.W.3d 750, 755 (Tenn. 2015) (quoting *State v. Harrison*, 270 S.W.3d 21, 27-28 (Tenn. 2008)).  The stage of the proceedings impacts the extent of the burden imposed upon a plaintiff to establish injury, causation, and redressability.  *Metro. Gov't of Nashville & Davidson Cnty. v. Tenn. Dep't of Educ.*, 645 S.W.3d at 149.  Where standing is raised via a motion to dismiss, as in the present case, the plaintiffs' "factual allegations are presumed to be true and are construed in their favor."  *Id.*  Furthermore, the Tennessee Supreme Court has rejected the heightened federal plausibility pleading standard of *Twombly*[7] and *Iqbal*,[8] preserving the requirement that parties need only satisfy Tennessee's traditional liberal notice pleading standard.  *Webb v. Nashville Area Habitat for Human., Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011).

As stated by the Tennessee Supreme Court, "[i]n general, courts are precluded 'from adjudicating an action at the instance of one whose rights have not been invaded or infringed.'"  *Fannon v. City of LaFollette*, 329 S.W.3d 418, 424 (Tenn. 2010) (quoting *Am. C.L. Union of Tenn.v. Darnell*, 195 S.W.3d 612, 619 (Tenn. 2006)).  Furthermore, "[s]tanding . . . may not be predicated upon an injury to an interest that the plaintiff shares in common with all other citizens."  *ACLU of Tenn. v. Darnell*, 195 S.W.3d at 620.  Such injuries, termed generalized grievances, are those that are "plainly undifferentiated and common to all members of the public."  *United States v. Richardson*, 418 U.S. 166, 176-77 (1974) (citation omitted); *see also Rutan-Ram*, 2023 WL 5441029, at *12 (describing a generalized grievance as an injury where there is no separation between a plaintiff and the public at large — where the injury is common among all citizens).

Here, the trial court erred in its application of the generalized grievance concept in two important respects.  One, the trial court errantly viewed an injury being suffered by a large number of persons as necessarily meaning that any suit in connection therewith would be a claim based upon a generalized grievance.  Two, the trial court failed to consider the Parents' specific allegations of injuries sustained by their children and whether those allegations advanced distinct and palpable injuries sufficient to satisfy the constitutional injury requirements to maintain standing.

As to the first, the trial court's ruling appears to be grounded in a conclusion that an injury suffered by a large number of persons renders a suit in connection therewith a non-justiciable suit based upon a generalized grievance.  However, "[t]he fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance.  The victims' injuries from a mass tort, for example, are widely shared, to be sure, but each individual suffers a particularized harm."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 n.7 (2016).  Simply stated, "an injury shared by a large number of people is nonetheless an injury."  *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 793 F.2d 1322, 1324 (D.C. Cir. 1986).  A contrary understanding is in error,

---

[7] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[8] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

for "[t]o deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread . . . actions could be questioned by nobody." *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 688 (1973). To the extent that the trial court concluded that the parents could not have standing because all Williamson County children were injured by the School Board's actions, which seems to have been the central basis of its decision, it misapplied the generalized grievance limitation on standing.

This does not, however, end our inquiry. The proper question is not whether many other Williamson County children were injured but instead whether the Parents alleged specific injuries to their children that are sufficient to meet the constitutional demands of constituting an injury for purposes of standing. As noted above, to satisfy the injury requirement for conventional standing under the Tennessee Constitution, the plaintiff must plead "a distinct and palpable injury; that is, an injury that is not conjectural, hypothetical, or predicated upon an interest that a litigant shares in common with the general public." *Fisher*, 604 S.W.3d at 396. By negating the possibility of such an injury to the Plaintiffs' children based upon the trial court's conclusion that other Williamson County students also had been injured, the trial court did not grapple with the particular allegations of injuries by the Plaintiffs as to their respective children.

The Amended Complaint contains allegations related to five children. C.L. is the minor child of J.P.L. and P.L. A.B. and B.B. are the minor children of Jennifer Doe. C.D. and D.D. are the minor children of Katherine Roe. Before delving more deeply into this matter, we note that C.L. is differently situated than the other four children, who were and are students in the Williamson County public schools. C.L.'s parents withdrew him from the Williamson County School System prior to the first grade and placed him in a private school where he has evidently adjusted quite well. We have been cited to no provisions of the Amended Complaint that indicate that C.L.'s parents intend to return C.L. to the County's public schools, nor are we aware of any such provisions in the Amended Complaint.[9] In other words, C.L. is not currently a student in the Williamson County public schools, and the Plaintiffs have not in their Amended Complaint asserted any intent or desire to return him to the Williamson County public schools should the County's alleged illegalities be addressed.

With regard to the justiciability of claims on behalf of C.L., this is problematic for the Plaintiffs. The Plaintiffs have not crafted an Amended Complaint that seeks damages for past injuries but instead they are focused on prospective relief in the form of a declaratory judgment and injunctive relief. Given the facts as pled by the Plaintiffs, we

---

[9] The Plaintiffs' brief on appeal states that C.L., "but for the unlawful actions of the Defendants, would have continued his education as a first grade student in the Williamson County school system," citing two paragraphs of the Amended Complaint. Assuming those two paragraphs can carry the weight of this assertion, which is less than certain, there is still no assertion in the Amended Complaint that his parents plan to return C.L. to Williamson County public schools.

fail to discern how the Plaintiffs' prospective-focused judicial relief claims on behalf of C.L. are justiciable. Pursuant to the Amended Complaint, C.L. is not a public-school student in Williamson County, and there is no indication in the Amended Complaint of an intent or desire to return to Williamson County public schools should the alleged illegality be removed. This seemingly places C.L. in the generalized grievance category, seeking to require the School Board to follow the cited laws while not actually being affected by that outcome. The Plaintiffs do not grapple with the question of how C.L.'s status as a private school student who has not expressed a desire or intent to return to Williamson County public school affects the parties' standing to bring claims on his behalf. With the trial court having found claims on behalf of C.L. to be non-justiciable, the failure to address this significant complication is problematic for the Plaintiffs in seeking to resuscitate claims on behalf of C.L. against the School Board. *See Sneed v. Bd. of Prof'l Responsibility of Supreme Court*, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived."). Accordingly, we find no error in the trial court's conclusion that claims on behalf of C.L. are non-justiciable or with its dismissal of those claims.

Allegations related to the other four children A.B., B.B., C.D., and D.D. do not present the same complications as C.L. They were and are students in Williamson County public schools. We turn next to considering whether their alleged injuries satisfy the constitutional requirements for an injury for purposes of standing under the Tennessee Constitution.

Here, the Plaintiffs alleged that each of these children was taught, in violation of Tennessee law, using a Common Core curriculum and a curriculum that taught multiple prohibited concepts. The Plaintiffs in their Amended Complaint addressed both the alleged impact of the curriculum generally and the impact of particular prohibited concepts allegedly being taught. The Plaintiffs' Amended Complaint connected these violations with injuries allegedly suffered by the individual children A.B., B.B., C.D., and D.D. The Plaintiffs alleged that, as result of the School Board's violation of Tennessee law, their children experienced psychological harm including anxiety, stress, and race-based guilt. The Parents also assert that they are trying to imbue their children with certain values which allegedly are being undermined by the use of a Common Core curriculum and the teaching of prohibited concepts in violation of Tennessee law. Additionally, the parents assert that their children's educational development, for example advancement in terms of reading ability, is being harmed by the use of a Common Core curriculum and inclusion of prohibited concepts in violation of Tennessee law. In other words, the Plaintiffs here are not merely alleging that the School Board's curriculum decisions were unwise or even illegal, but instead are alleging that their children experienced actual psychologically harm, had their values undermined, and had their educational advancement hampered by the School Board's use of a Common Core curriculum and by teaching prohibited concepts.

13

These alleged injuries are, according to the Plaintiffs' Amended Complaint, directly related to the alleged illegalities through a curriculum that allegedly teaches prohibited concepts in violation of section 49-6-1019 and adopts a Common Core curriculum in violation of section 49-6-2206(b)(2)(A).

The injuries alleged by the Plaintiffs on behalf of their children also appear to be akin to the type of harm that the General Assembly was seeking to prevent through the adoption of these statutory prohibitions. For example, Tennessee Code Annotated section 49-6-1019(a)(6) prohibits LEAs from including in their curriculum the concept that "[a]n individual should feel discomfort, guilt, anguish, or another form of psychological distress solely because of the individual's race or sex." The Plaintiffs allege the School Board violated this limitation and in doing so has caused their children to experience precisely such race-based guilt.

Here, the individual plaintiffs pled particular facts asserting their children's injuries – specifically how certain aspects of the Wit & Wisdom curriculum and the teaching of prohibited concepts injured their children through a combination of psychological harm, undermining the values taught within their family, and hampering their educational development. Under the Amended Complaint, these were not hypothetical or theoretical injuries, but instead actual, concrete, particularized injuries that have been suffered. That there may be many other children who experienced similar harms does not make the alleged injury any less of a personal injury as to A.B., B.B., C.D., and D.D.

In other words, the Plaintiffs are not upset about the violations of Tennessee law in which the children share a generalized grievance with all citizens who may wish to see the School Board adhere to the law. The Parents are instead alleging that their children are personally and actually being directly harmed by the violations of Tennessee law. In the context of the statutory violations alleged, these are not generalized grievances but distinct and palpable injuries. The trial court did not address any of these allegations. Having considered the injuries asserted in the Amended Complaint, we conclude that the trial court erred in determining that the Parents lacked standing due to a lack of distinct and palpable injuries.

We note that our determination in this case is intertwined with the stage of the proceedings – that is, the context of reviewing the trial court's grant of a motion to dismiss based upon lack of standing. We take no view on the question of whether the Plaintiffs' children actually suffered any such injuries. The question before us is not whether the Plaintiffs' children or any other children were actually injured but instead whether, presuming the allegations of the Amended Complaint to be true and construing the allegations in favor of the Plaintiffs, they have adequately alleged injuries sufficient to satisfy the minimum constitutional requirements for an injury for purposes of conventional standing. *See Metro. Gov't of Nashville & Davidson Cnty. v. Tenn. Dep't of Educ*, 645 S.W.3d at 149. Nothing in our ruling prevents the School Board from raising a challenge

to Plaintiffs' standing at a later stage of the proceedings based on the further development of facts.

As for organizational standing, the trial court's basis for dismissing Parents' Choice for lack of organizational standing was predicated upon the lack of standing of its members, the Parents. The trial court's ruling as to organizational standing followed quite reasonably from its analysis of the Parents' standing. *See generally ACLU of Tenn.*, 195 S.W.3d at 626 (noting that to establish organizational standing, an organization must show "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit"). However, because the Parent members do have standing, the trial court's basis for finding lack of organizational standing evaporates. Accordingly, we conclude that the trial court erred in determining that Parents' Choice lacked organizational standing.

B.

The School Board also contends that the Plaintiffs' case is non-justiciable under the political question doctrine. Having determined the Plaintiffs' case to be non-justiciable due to lack of standing, the trial court did not address the School Board's political question argument. In opposition to the School Board's position, which it renewed on appeal before this court, the Plaintiffs argue that the political question doctrine is inapplicable to the present case.

As noted above, the political question doctrine limitation on judicial authority in Tennessee is a product of the separation of powers provided for by the Tennessee Constitution. *See Bredesen v. Tenn. Jud. Selection Comm'n*, 214 S.W.3d 419, 434 (Tenn. 2007). In delineating the broad strokes of what constitutes a political question, Tennessee courts have embraced the federal formulation. *Id.* at 435. The seminal federal case examining the political question doctrine is *Baker v. Carr*, 369 U.S 186 (1962).[10] The Supreme Court in *Baker v. Carr* "canvased the field of 'political question cases to infer from them the analytical threads that make up the political question doctrine' . . . [and]

---

[10] *See, e.g.*, *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 841 (D.C. Cir. 2010) (characterizing *Baker v. Carr* as "the seminal case" of the political question doctrine); *Greenham Women Against Cruise Missiles v. Reagan*, 591 F. Supp. 1332, 1335 (S.D.N.Y. 1984), *aff'd*, 755 F.2d 34 (2d Cir. 1985) ("The most authoritative and commonly cited formulation of the political question doctrine is that of Justice Brennan in the seminal case of *Baker v. Carr*."); *Kan. Bldg. Indus. Workers Comp. Fund v. State*, 359 P.3d 33, 42 (Kan. 2015) ("The seminal United States Supreme Court case on the political question doctrine is *Baker v. Carr*."); *Pa. Sch. Boards Ass'n, Inc. v. Commonwealth Ass'n of Sch. Adm'rs, Teamsters Loc. 502*, 805 A.2d 476, 485 (Pa. 2002) (describing *Baker v. Carr* as "the seminal case" of the political question doctrine).

"[f]rom this review of the existing political question jurisprudence"[11] ultimately "synthesized the cases" into the six strands of the political question doctrine.[12]

In addressing the political question doctrine under the Tennessee Constitution in relation to separation of powers principles, this court borrowed the handiwork of the United States Supreme Court in *Baker v. Carr*, embracing its six strands:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Mayhew v. Wilder*, 46 S.W.3d 760, 773 (Tenn. Ct. App. 2001) (quoting *Baker*, 369 U.S. at 217). The Tennessee Supreme Court subsequently approved of this court's formulation and embraced the same six strands. *See Bredesen*, 214 S.W.3d at 435.[13]

The School Board's argument in the present case presses upon the second and third strands of the political question doctrine, with its primary focus on the third. The argument advanced is, essentially, that the General Assembly has afforded to local boards of education and the Tennessee Department of Education broad discretion and authority to make determinations regarding instruction in Tennessee's schools. Accordingly, the Defendant argues Tennessee courts cannot decide whether the statutes adopted by the General Assembly have been violated without making their own policy determinations. In other words, because the policy-making discretion afforded to the local school boards and Tennessee Department of Education is extremely broad, there is no role for judicial review.

---

[11] Michael Teter, *Reinvigorating the Judiciary's Role in Resolving Interbranch Disputes*, 2014 Utah L. Rev. 897, 902 (2014).

[12] Heather P. Scribner, *A Fundamental Misconception of Separation of Powers*: Boumediene v. Bush, 14 Tex. Rev. L. & Pol. 90, 121 (2009).

[13] Tennessee's adoption of the same six strands as embraced by federal courts does not mean that the application of these categories will match that of federal courts. Federal authority remains persuasive rather than mandatory and what constitutes a political question in Tennessee state courts is ultimately a question of the interpretation of the Tennessee Constitution.

The School Board's argument is ultimately more supportive of a deferential judicial approach to reviewing challenges to decisions reached by local school boards and the Department of Education[14] than it is to warranting a total judicial abdication under the political question doctrine. The Plaintiffs' claims are predicated upon claims of transgression of two statutes in which the General Assembly has addressed what may be taught in Tennessee public schools. The Plaintiffs allege that the School Board violated Tennessee Code Annotated section 49-6-1019, which prohibits teaching of certain enumerated restricted concepts (the Prohibited Concepts Claim), and Tennessee Code Annotated section 49-6-2206(b)(2)(A), which prohibits use of Common Core textbooks and instructional materials and those marketed as Common Core (the Common Core Claim). In alleging that these statutes have been violated, the Plaintiffs are not inherently asking Tennessee courts to make a policy determination as to the substance of what should and should not be taught in Tennessee public school classrooms. The Tennessee General Assembly has already made that determination. The courts are instead being asked to determine whether the School Board transgressed the statutorily imposed prohibitions crafted by the General Assembly. As for discretion afforded, assuming for purposes of argument that the School Board is correct insofar as the zone of discretion afforded to local school boards and the Department of Education is as wide as an ocean, there are still shores where the water comes to an end, and figuring out where the metaphorical ocean and shore meet presents a question of statutory interpretation.

More than a century ago, addressing separation of powers, the Tennessee Supreme Court observed that "[t]heoretically, the legislative power is the authority to make, order, and repeal, the executive . . . [is the power to] administer and enforce, and the judicial . . . [is the power to] interpret and apply, laws." *Richardson v. Young*, 125 S.W. 664, 668 (Tenn. 1910). State courts have repeatedly rejected arguments invoking the political question doctrine in a manner that interferes with the judiciary's statutory interpretation role. *See*, *e.g.*, *Moss v. Bd. of Cnty. Comm'rs for Boulder Cnty.*, 411 P.3d 918, 922 (Colo Ct. App. 2015) (citation omitted) ("Interpreting those provisions in no way infringes on the powers and duties of other branches of government. . . . Indeed, statutory interpretation is a question of law that is traditionally within the role of the judiciary to resolve."); *Office of Hawaiian Affairs. v. Kondo*, 528 P.3d 243, 251 (Haw. 2023) (rejecting a contention the political question doctrine rendered a matter non-justiciable because "[s]tatutory interpretation is the judiciary's forte, central to its mission" and a court engaging in statutory interpretation "does not intrude on another governmental branch"); *Bedke v. Ellsworth*, 480 P.3d 121, 130 (Idaho 2021) (rejecting an argument for application of the political question doctrine, noting that "[i]nterpreting statutes is a fundamental responsibility of the judiciary"); *N.J. Election Law Enf't Comm'n v. DiVincenzo*, 169 A.3d 1002, 1008 (N.J. App. Div. 2017) ("The question presented here is one of statutory

---

[14] In this case, we are not deciding either that a degree of deference is due to such decision-making or the extent to which deference may be due. That question is not before us in the present case; rather, our reference here is that School Board's argument is better addressed to seeking deferential review than it is to establishing that this case presents a political question.

interpretation and does not implicate any of the criteria for a nonjusticiable controversy."); *Creswick v. Univ. of S.C.*, 862 S.E.2d 706, 708 (S.C. 2021) ("Contrary to the Attorney General's position that this matter presents a political question, we hold this action involves solely a question of statutory interpretation.").

The United States Supreme Court has reached the same conclusions as state courts, rejecting invocation of the political question doctrine in a manner that invades the role of the courts in interpreting statutes. Addressing a case involving the Secretary of Commerce, international agreements, Congressional legislation, foreign affairs with Japan, and whaling, the United States Supreme Court declined to find the political question doctrine to be applicable. *See generally Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221 (1986). The Court explained its reasoning as follows:

> [C]ourts have the authority to construe treaties and executive agreements, and it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts. It is also evident that the challenge to the Secretary's decision not to certify Japan for harvesting whales in excess of [International Whaling Commission] quotas presents a purely legal question of statutory interpretation. The Court must first determine the nature and scope of the duty imposed upon the Secretary by the Amendments, a decision which calls for applying no more than the traditional rules of statutory construction, and then applying this analysis to the particular set of facts presented below. We are cognizant of the interplay between these Amendments and the conduct of this Nation's foreign relations, and we recognize the premier role which both Congress and the Executive play in this field. But under the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones. We conclude, therefore, that the present cases present a justiciable controversy . . . .

*Id*. at 230.

Similarly, in *Zivotofsky v. Clinton*, the United States Supreme Court rejected the argument that a plaintiff's suit to vindicate a "statutory right" created by Congress, "to choose to have Israel recorded on his passport as his place of birth," instead of simply Jerusalem, presented a nonjusticiable political question. *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012). The Supreme Court stated:

> The existence of a statutory right, however, is certainly relevant to the Judiciary's power to decide Zivotofsky's claim. The federal courts are not being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination of what United States policy

toward Jerusalem should be. Instead, Zivotofsky requests that the courts enforce a specific statutory right. To resolve his claim, the Judiciary must decide if Zivotofsky's interpretation of the statute is correct, and whether the statute is constitutional. This is a familiar judicial exercise.

*Id*. at 196. The Supreme Court further explained:

Resolution of Zivotofsky's claim demands careful examination of the textual, structural, and historical evidence put forward by the parties regarding the nature of the statute and of the passport and recognition powers. This is what courts do. The political question doctrine poses no bar to judicial review of this case.

*Id*. at 201.

We do not doubt that the interpretation of the statutory provisions that the Plaintiffs assert were violated may present challenging questions of interpretation for Tennessee courts, but the presence of a difficult question does not usher out the judiciary via the political question doctrine. There is a qualitative difference between hard questions and political questions. One involves metaphorically rolling up one's sleeves and getting to work as a court; the other involves abandoning the field because the state or federal constitution requires the court to do so. Local boards of education and the Department of Education may be entitled to deference, perhaps even to a significant degree,[15] but the political question doctrine does not provide for deference – it demands total abandonment. There is a chasm between deference and abdication. However challenging the questions raised may ultimately be, it is clear that there are some discernable lines. The Tennessee Supreme Court has stated that the political question doctrine will render a case non-justiciable only "in rare cases"; this is not one of them. *See Bredesen*, 214 S.W.3d at 434.

C.

As an alternative ground for dismissal, the trial court determined the Plaintiffs were required to exhaust their administrative remedies and failed to do so. There is some ambiguity in the trial court's Memorandum and Opinion regarding this ground for dismissal. The trial court stated that "[b]ecause these procedures were not exhausted prior to filing suit, as an alternate ruling, the Court also DISMISSES the case on this ground." The School Board, however, did not seek dismissal of "the case" based upon failure to exhaust administrative remedies. While the School Board sought dismissal of the Plaintiffs' Amended Complaint in its entirety on a number of grounds, the School Board only pursued dismissal for failure to exhaust as to Prohibited Concepts Claims. As noted

---

[15] As noted above, the question of whether deference should be afforded and if so to what degree is not before the court in the present case.

above, the Plaintiffs' Prohibited Concepts Claim asserts a violation of Tennessee Code Annotated section 49-6-1019, which prohibits teaching of certain enumerated restricted concepts, whereas the Plaintiffs' Common Core Claim alleges a violation of Tennessee Code Annotated section 49-6-2206(b)(2)(A), which prohibits use of Common Core textbooks and instructional materials. In addressing the Plaintiffs' failure to exhaust administrative remedies in its briefing before the trial court, the School Board's argument was framed in connection with the Prohibited Concepts Claim, related solely to that claim, and exclusively referenced that claim.[16] In setting forth the School Board's argument in its Memorandum and Opinion, the trial court expressly noted that the School Board argued that the Prohibited Concepts Claim "should be dismissed because the applicable statutory and regulatory procedures have not yet been exhausted." The trial court's analysis regarding failure to exhaust administrative remedies was also tied exclusively to that claim. On appeal before this court, the School Board only argues in support of trial court's dismissal as to failure to exhaust remedies in relation to the Prohibited Concepts Claim. The School Board does not separately argue that the Common Core Claim is subject to an exhaustion of administrative remedies requirement or argue that the trial court's order dismissed the Common Core Claim. Accordingly, while the trial court's Memorandum and Order states that failure to exhaust was an alternative basis for dismissal of "the case," we understand the trial court to have only dismissed the Prohibited Concepts Claim upon this basis and not the Common Core Claim.

Regarding the trial court's dismissal of the Prohibited Concepts Claim due to failure to exhaust administrative remedies, the Plaintiffs argue the trial court erred in dismissing on this basis. The Plaintiffs do not either contest the existence of the relevant administrative procedures or suggest that they availed themselves of those administrative procedures. They concede on both accounts. Rather, they argue that pursuing the administrative procedures is not mandatory and, in any event, would have been futile. Therefore, the Plaintiffs assert that exhaustion of administrative remedies was not required for their Prohibited Concepts Claim to be heard by a court. In other words, they contend that they may advance this claim in court without first proceeding through the relevant administrative process. The School Board disagrees. The School Board argues that the trial court properly concluded that the Plaintiffs were required to exhaust their administrative remedies and note the Plaintiffs' concession that they failed to do so.

---

[16] The section heading preceding the School Board's argument before the trial court is expressly tied to the Prohibited Concepts Claim, which matches the argument advanced in the section of the School's Board Memorandum in support its motion to dismiss. The heading stated "COUNT I OF THE AMENDED COMPLAINT MUST BE DISMISSED BECAUSE THE APPLICABLE STATUTORY AND REGULATORY PROCEDURES MUST BE EXHAUSTED BEFORE SEEKING RELIEF IN COURT." Count I set forth the Plaintiffs' Prohibited Concepts Claim.

While distinct conceptually from the ripeness doctrine,[17] the requirement of exhaustion of administrative remedies functions as a form of procedural ripeness. Where justiciability concerns of this variety are present, it is not that the parties cannot ever have their case heard by a court; rather, it is that a party who has not exhausted her claims has not yet followed the prerequisite that unlocks the door to her case being heard in court. The Tennessee Supreme Court explained the rationale for requiring exhaustion of administrative remedies as follows:

> By discouraging premature judicial interference with agency processes, the exhaustion doctrine serves several goals. First, it allows an administrative agency to function efficiently and to correct its own errors. Second, it "allows the agency to develop a more complete administrative record upon which the court can make its review." Third, the doctrine allows agencies to take full advantage of their particular expertise in specialized fact-finding, the interpretation of contested technical subject matter, and disputes over the agency's regulations.

*Bailey v. Blount Cnty. Bd. of Educ.*, 303 S.W.3d 216, 236 (Tenn. 2010).

There are important distinctions between exhaustion of administrative remedies being mandatory as a matter of law and circumstances where exhaustion is required by a court in the exercise of its discretion. The Tennessee Supreme Court has indicated that "when exhaustion of administrative remedies is required by statute, the failure to do so will deprive the court of subject matter jurisdiction." *Chattanooga-Hamilton Cnty. Hosp. Auth. v. UnitedHealthcare Plan of the River Valley, Inc.*, 475 S.W.3d 746, 758 (Tenn. 2015); *see also Pickard v. Tenn. Water Quality Control Bd.*, 424 S.W.3d 511, 523 (Tenn. 2013) ("When exhaustion is a clear statutory requirement, 'exhaustion is an absolute prerequisite for relief,' and failure to exhaust administrative remedies will defeat a reviewing court's subject matter jurisdiction."). Alternatively, in the absence of a legal mandate, "the exhaustion of the administrative remedies doctrine is a matter of judicial discretion" and subject to review under an abuse of discretion standard. *Ready Mix, USA, LLC v. Jefferson Cnty.*, 380 S.W.3d 52, 64 (Tenn. 2012).

In concluding that exhaustion is mandatory in the present case, the trial court drew upon the Department of Education's regulations that were promulgated with the express "purpose . . . to effectuate T.C.A. § 49-6-1019." Tenn. Comp. R. & Regs. 0520-12-04-.01.

---

[17] "The central concern of the ripeness doctrine is whether the case involves uncertain or contingent future events that may or may not occur as anticipated or, indeed, may not occur at all." *B & B Enters. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d 839, 848 (Tenn. 2010).

The trial court determined that, under these regulations, exhaustion of administrative remedies is mandatory.

The Plaintiffs contend that the regulations are not mandatory upon parents of public school students. We disagree. The regulations promulgated by the Department of Education to effectuate Tennessee Code Annotated section 49-6-1019, the prohibited concepts law, set out a specific and mandatory administrative procedure. Tenn. Comp. R. & Regs. 0520-12-04-.05, entitled "Reporting and Investigating Prohibited Concepts," mandates that a complaint about violations of the law must be filed with the LEA or public charter school in which the allegation(s) arose:

> To file a complaint alleging the Prohibited Concepts are being or have been included or promoted in a course of instruction, curriculum and instructional program, or in supplemental instructional materials of an LEA or public charter school, a complainant *must* file a complaint with the LEA or public charter school in which the allegation(s) arose. An eligible complainant may, but is not required to, use the complaint form provided by the LEA or charter school, so long as the complaint contains the information required by Section 0520-12-04-.05(5).

Tenn. Comp. R. & Regs. 0520-12-04-.05(2) (emphasis added). An LEA is defined by statute:

> "Local education agency (LEA)," "school system," "public school system," "local school system," "school district," or "local school district" means any county school system, city school system, special school district, unified school system, metropolitan school system or any other local public school system or school district created or authorized by the general assembly.

Tenn. Code Ann. § 49-1-103(2); *see also* Tenn. Comp. R. & Regs. 0520-12-04-.02 (referring to Tennessee Code Annotated section 49-1-103 for the definition of LEA for purposes of the regulation).

On appeal, the Plaintiffs argue this regulation is not mandatory as to parents but instead only creates a mandatory procedure for an LEA if parents file a complaint. In support of this contention, the Plaintiffs note that multiple provisions of the regulations related to prohibited concepts impose mandatory duties upon the LEA and not parents.[18]

---

[18] *See*, *e.g.*, Tenn. Comp. R. & Regs. 0520-12-04-.05(6) ("Upon receipt of a complaint, the LEA or public charter school *shall* determine whether it has the authority to investigate the complaint." (emphasis added)); Tenn. Comp. R. & Regs. 0520-12-04-.05(7) ("Within fifteen (15) calendar days of receiving the complaint, the LEA or public charter *shall* send a letter to the complainant explaining whether it has authority to investigate the complaint and will be initiating an investigation." (emphasis added)); Tenn. Comp. R. & Regs. 0520-12-04-.05(8) ("Within sixty (60) calendar days of receiving the complaint, the LEA

The multitude of mandatory requirements imposed on the LEA under the regulations does not make the imposition of the filing requirements upon parents any less mandatory. "Complainant" is defined in Section 0520-12-04-.02 as "a current student of the LEA . . . in which the allegation(s) arose [or] a parent of a current student of the LEA . . . in which the allegation(s) arose . . . ." And, it is complainants who "*must* file a complaint with the LEA or public charter school in which the allegation(s) arose." Tenn. Comp. R. & Regs. 0520-12-04-.05(2) (emphasis added).

We note that "administrative rules and regulations" have "the force and effect of law in Tennessee." *Swift v. Campbell*, 159 S.W.3d 565, 572 (Tenn. Ct. App. 2004). The Plaintiffs have not challenged the administrative regulation. Their argument is limited to the contention that the regulations are not mandatory upon parents seeking to file a complaint regarding the teaching of prohibited concepts but instead are only mandatory upon the LEA should parents file such a complaint. Regarding whether the regulations are mandatory, we consider only the argument advanced by the Plaintiffs. *See Sneed*, 301 S.W.3d at 615 (noting "[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her . . ."). Addressing the argument advanced by the Plaintiffs, we find no error in the trial court's conclusion that the Department of Education regulations render exhaustion of administrative remedies mandatory for the Parents who are bringing complaints regarding the teaching of prohibited concepts in violation of Tennessee Code Annotated Section 49-6-1019.

The Plaintiffs contend that even if the regulations are mandatory that, nevertheless, an exception is applicable in the present case based upon futility. Tennessee courts have recognized an exception to the requirement to exhaust administrative remedies based upon futility. *See, e.g.*, *Bailey*, 303 S.W.3d at 236; *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525-26 (Tenn. 2005); *Cantrell v. Walker Die Casting, Inc.*, 121 S.W.3d 391, 396 n. 3 (Tenn. Ct. App. 2003). Unsurprisingly, for a party seeking to avoid having to exhaust administrative remedies where they are mandatory by law, the bar to surmount is high. The Tennessee Supreme Court has indicated that "[t]he standard for adjudging the futility of resorting to the administrative remedies . . . is *whether a clear and positive indication of futility can be made. A plaintiff must show that it is certain that his claim will*

---

or public charter school *shall* determine whether the allegation(s) in the complaint is substantiated." (emphasis added)); Tenn. Comp. R. & Regs. 0520-12-04-.05(9) ("The LEA or public charter school *shall* issue a written determination stating whether the allegation(s) in the complaint is substantiated. The written determination *shall* be communicated to the complainant and the individual alleged to have included or promoted the Prohibited Concept." (emphasis added)); Tenn. Comp. R. & Regs. 0520-12-04-.05(10) ("If an alleged violation is substantiated, the LEA or public charter school *shall* take appropriate remedial action to ensure that the Prohibited Concept(s) is no longer included in a course of instruction, curriculum and instructional program, or supplemental instructional materials." (emphasis added)); Tenn. Comp. R. & Regs. 0520-12-04-.05(11) ("The LEA or public charter school *shall* maintain, for five (5) years, an investigative file containing the complaint, the initiating letter, any interview notes, any electronic or physical evidence obtained, any other notes maintained by the investigator, and a copy of the written determination issued in the matter." (emphasis added)).

*be denied* on appeal, *not merely that he doubts . . .* a different decision." *Bailey*, 303 S.W.3d at 236 (quoting *Cantrell*, 121 S.W.3d at 396 n.3) (emphasis added). Simply stated, "[t]he futility exception is . . . quite restricted and has been applied only when resort to administrative remedies is clearly useless." *Bailey*, 303 S.W.3d at 236 (quoting *Commc'ns Workers of Am. v. AT & T*, 40 F.3d 426, 432 (D.C. Cir. 1994)); *see also Cantrell*, 121 S.W.3d at 396 n.3. The Tennessee Supreme Court has described the showing necessary for demonstrating futility as an administrative process that is "pointless" and "a foregone conclusion." *Bailey*, 303 S.W.3d at 236.

The Plaintiffs raise four arguments which they place under the umbrella of futility. One, they contend that the School Board holds a negative and antagonistic view of complaints such as theirs. Two, they argue the administrative process is too lengthy. Three, they point to challenges for parents in fully understanding what is being taught in their children's schools and being able to adequately demonstrate a violation in a complaint to their LEA. Four, the Plaintiffs note because violations appear at each grade-level it could be necessary for parents to file multiple complaints.

As for the first purported basis for futility, the Plaintiffs allege that various School Board and Department of Education officials have publicly indicated their approval of the Wit & Wisdom curriculum and have stated that the curriculum does not teach Critical Race Theory, which is a contention advanced in the Plaintiffs' Amended Complaint. Additionally, the Plaintiffs allege that some other parents who have discussed concerns with LEA officials have been "derided and laughed at" and given inadequate information about the complaint process, and that some complaints lodged in the past with the LEA have been downplayed or ignored. The Plaintiffs do not, however, suggest that they have been deprived of access to the administrative process or that information is not publicly available as to how to access the process. Furthermore, the Plaintiffs concede that the LEA has made multiple changes in response to complaints from other parents. While the Plaintiffs' allegations may suggest an uphill path, they do not demonstrate a "pointless" exercise or a "foregone conclusion."

The Plaintiffs also argue that the administrative process is lengthy in support of their assertion of futility. The Plaintiffs do not cite to any Tennessee case law wherein parties have been relieved of exhaustion requirements on this basis, but instead cite only to *Parks v. Pavkovic*, 536 F. Supp. 296 (N.D. Ill. 1982), a federal district court case from the Northern District of Illinois. The present case, however, bears no resemblance to the Plaintiffs' cited authority. There, the court found administrative remedies inadequate where the plaintiffs had "done everything possible to obtain speedy administrative review, but [had] been unable to do so through no fault of their own. In fact, it [was] the defendants who [were] at fault, because of their failure to decide plaintiffs' administrative appeal within the time specified by federal law." *Parks*, 536 F. Supp. at 302-03. Here, the Plaintiffs have not availed themselves of the administrative process only to be confronted by governmental actors who are not adhering to legal requirements as to the timing of the

process set forth in regulations. To the contrary, the Plaintiffs did not pursue the procedural remedies that were afforded. They have also failed to explore how the timing of the administrative process compares with seeking a judicial remedy or how the timing of the judicial process itself may be streamlined by a narrowing or clarification of the issues through the administrative process.

Furthermore, the Plaintiffs' timing argument ignores that, at various points in the administrative review process, complainants may actually get the resolution they desire much more quickly. In fact, the regulations themselves provide for possible early resolution of complaints. Tennessee Comprehensive Rules & Regulations 0520-12-04-.06, entitled "Early Resolution of Complaints," not only provides for, but encourages, a procedure in which the complainant and the LEA can work collaboratively to come to an agreed solution to a complaint in the form of a "resolution agreement." More fundamentally, the Plaintiffs' argument assumes that error will not be admitted by the LEA. This runs contrary to a foundational basis of the exhaustion requirement, which is that exhaustion affords an opportunity to correct errors. *Bailey*, 303 S.W.3d at 236. The Plaintiffs also fail to consider that consequences are imposed upon LEAs that persist in engaging in knowing violations of the prohibited concepts law in the face of complaints. *See*, *e.g.*, Tenn. Code Ann. § 49-6-2206(b)(2)(B) (providing that "[t]he commissioner of education shall withhold a portion of the state education finance funds that an LEA is otherwise eligible to receive if a teacher or principal employed by the LEA intentionally violates subdivision (b)(2)(A) by purposefully using, or permitting to be used, in the person's school, textbooks or instructional materials created to align exclusively with the Common Core State Standards or that are marketed as Common Core textbooks or materials"); Tenn. Comp. R. & Regs. 0520-12-04-.08(1)(C) (including as part of the definition of knowing violation that the LEA "[d]etermined that the allegation(s) was substantiated, but failed to remedy the violation"); Tenn. Comp. R. & Regs. 0520-12-04-.06(2) (stating that "[e]ntry into an early resolution agreement shall not constitute an admission that the LEA or public charter school knowingly violated T.C.A. § 49-6-1019 or that the individual alleged to have included or promoted the Prohibited Concept, in fact, included or promoted a Prohibited Concept").

The Plaintiffs offer two more arguments in support of their contention that they need not exhaust administrative remedies due to futility. As a third basis, they contend that it is difficult for parents to know precisely what is being taught in their children's schools so as to be able to demonstrate teaching of a prohibited concept. They concede, as the School Board notes, that parents are free to learn more by, among other things, acting to "review course syllabi, maintain an open line of communication with their children's teacher(s), review the books assigned, or by simply asking their children what they learned in school that day." The Plaintiffs counter that "Social Emotional Learning," which they allege equals critical race theory "is far more nuanced than simply looking at the syllabi, talking to the teacher or the student, or simply reading the books." The Plaintiffs do not specify, and we fail to discern how this argument supports an elimination of the requirement to

exhaust administrative remedies. The uncertainty referenced by the Plaintiffs seems more in accord with potential advantage of an administrative process that may avoid completely unnecessary lawsuits predicated upon misunderstandings or errant perceptions. As for their fourth basis for asserting futility, the plaintiffs contend that because the Wit & Wisdom curriculum, which allegedly teaches prohibited concepts, is taught in all the elementary grade levels, parents would need to re-file a complaint in each academic school year that an alleged violation occurs. This argument ignores the possibility of more global remedial action being taken by the LEA in response to a complaint, but even if the factual predicate is accepted, the Plaintiffs offer no authority or additional argument to explain how this requirement is so onerous as to excuse a legal requirement to exhaust administrative remedies.

Therefore, we find no error in the trial court's conclusion that the Plaintiffs' Prohibited Concepts Claim is subject to an exhaustion requirements and dismissal thereof for failure to comply with the mandatory procedure.

IV.

In addition to the aforementioned justiciability doctrines, the School Board also argues that the Plaintiffs' claims should be dismissed because there is no private right of action that has been created to allow for a suit based upon the statutory violations which the Plaintiffs allege. Having concluded that the Plaintiffs lacked standing, the trial court did not address this argument, which the School Board renews on appeal before this court. Given our justiciability based dismissal of the Plaintiffs' Prohibited Concepts Claim for failure to exhaust administrative remedies, we address the private right of action issue solely as to the Plaintiffs' Common Core Claim.

The Tennessee Supreme Court has observed that in determining if a private right of action exists to enforce a statutory requirement "[a] court can find that the legislature created a private right of action in one of two ways: based on the express terms of a statute or by implication through the statute's structure and legislative history." *Affordable Constr. Servs., Inc. v. Auto-Owners Ins. Co.*, 621 S.W.3d 693, 696 (Tenn. 2021). In other words, the private right of action for enforcement of a statute is a legislative creation that is express or implied. *See id.* The Tennessee Supreme Court has indicated that the ultimate touchstone for analysis is whether the General Assembly "intended for a private right of action to exist." *Id.*

The School Board notes that Tennessee Code Annotated section 49-6-2206 does not expressly create a private of right of action and suggests that language therein runs contrary to implying a private right of action. They are correct on both accounts. Tennessee Code Annotated section 49-6-2206 does not expressly create a private right of action and the Code section does not appear to imply the existence of a private right of action. The

problems for the School Board, however, is that a private right of action applicable to the Plaintiffs' Common Core Claim is created in Tennessee Code Annotated section 1-3-121.

Chapter 3 of Title 1 of the Tennessee Code addresses the "Construction of Statutes." Tennessee Code Annotated section 1-3-121 provides that

Notwithstanding any law to the contrary, a cause of action shall exist under this chapter for any affected person who seeks declaratory or injunctive relief in any action brought regarding the legality or constitutionality of a governmental action. A cause of action shall not exist under this chapter to seek damages.

Addressing section 1-3-121, the Tennessee Supreme Court observed that

The plain meaning of this text expressly recognizes the existence of causes of action "regarding the legality or constitutionality of a governmental action" that seek declaratory or injunctive relief. Causes of action "regarding the legality or constitutionality of governmental action" must of necessity be brought against governmental entities . . . .

*Recipient of Final Expunction Ord. in McNairy Cnty. Cir. Ct. Case No. 3279 v. Rausch*, 645 S.W.3d 160, 168 (Tenn. 2022).

The plain language of section 1-3-121 creates a private right of action – "a cause of action shall exist … for any affected person" – when that person seeks declaratory or injunctive relief, not damages, challenging the legality of a governmental action. The plain language specifically dismisses any concern of contradiction with other law in its sweeping pronouncement, "[n]otwithstanding any law to the contrary." Furthermore, this is not a case in which there is interpretive tension through a more specific negation or denial of a private right of action either with regard Tennessee Code Annotated section 49-6-2206 or the type of claim being advanced by the Plaintiffs.

The Plaintiffs' Common Core Claim fits precisely within the contours of a private right of action created by Tennessee Code Annotated section 1-3-121. The Plaintiffs are affected persons who are seeking declaratory and injunctive relief, rather than damages, and challenging the legality of a governmental action. Specifically, they are arguing that the School Board violated Tennessee Code Annotated section 49-6-2206(b)(2)(A) by requiring teachers and principals in public schools to use "textbooks or instructional materials created to align exclusively with the Common Core State Standards or that are marketed as Common Core textbooks or materials."

Our conclusion as to the private right of action question in this case is based upon the plain language of Tennessee Code Annotated section 1-3-121. While not grounding

our opinion in legislative history, we do note that the legislative history of 2018 Public Acts Chapter 621 section 1 is consistent with our plain language reading. The House Sponsor, then-Majority Leader Glen Casada, at the final reading of the proposed legislation before the full Tennessee House of Representatives, was specifically asked whether it was intended that citizens would have private rights of action for Tennessee Code provisions that did not currently authorize such suits, and answered in the affirmative.[19] In committee, the Senate sponsor, Senator Jon Lundberg, in explaining the proposed legislation to committee members, also expressly indicated that this legislation was designed to address circumstances where there is not a specific cause of action to address unconstitutional or illegal governmental action, providing one so long as it is not for an action seeking damages.[20]

---

[19] Leader Casada: [This bill] has to do with giving the right of the citizen to take government to court if they violate our state law or our constitutional rights. It makes it very clear and cold that we have that right . . . . That is what this bill does.
. . .
Representative Clemons: Mr. Leader, the breadth of this provision in Title I Chapter 3 – is this intended to apply across the board to any action against the government?

Leader Casada: Declaratory action.

Representative Clemons: Or injunctive relief?

Leader Casada: Or injunctive. . . .
. . .
Representative Clemons: I want to make sure the intent of this legislation is as I understand it which is the breadth so if any cause of action against the government in the Code or elsewhere does not currently contain a cause, a private cause of action you are creating one with this legislation?

Leader Casada: I would submit we are making it clear that it already exists. I think we have passed legislation in the past. Lower courts have opined that citizens don't have a right to take their government to court. I contend that we have on many occasions said that they do. But it we are making it very clear that they do.
. . .
Representative Clemons: . . . My original question was if we are creating this new or at least clarifying that everyone has standing that it then opens up the entire Code for any Code that is not currently or may not have a private cause of action for something prohibited that we are opening that door up -- I just want to make that clear.

Leader Casada: Yes sir.

[20] Senator Lundberg: . . . A lot of folks thought well they couldn't sue cities and states because they didn't have a specific cause of action. This says again they can but not for damages.
. . .
Senator Kelsey: . . . It only applies if you are not seeking damages so you cannot be asking for money is that correct?

Senator Lundberg: Absolutely. Precisely.

## V.

For the reasons discussed above, we affirm the trial court's dismissal of P.J.L. and J.L. and their child C.L. based upon lack of standing. We conclude, however, that the trial court erred in determining that Jennifer Roe and her children A.B. and B.B. and Katherine Roe and her children C.D. and D.D. do not have standing and that Parents' Choice Tennessee lacks standing. We conclude that the trial court properly determined that the remaining Plaintiffs' Prohibited Concepts Claim is subject to a mandatory exhaustion requirement and properly dismissed their claim due to failure to exhaust. We reverse the trial court's dismissal of the remaining Plaintiffs' Common Core Claim.

Costs of the appeal are taxed equally to the Appellants, Parents Choice Tennessee, P.J.L., J.L., Jennifer Roe, and Katherine Roe, and the Appellee, the Williamson County Board of Education. We remand for further proceedings consistent with this opinion.

_____
JEFFREY USMAN, JUDGE

---

. . .

Senator Lundberg: . . . There are recent court opinions that have expanded the intent of the original law again that is just that people are prohibited from filing those suits. This clarifies that they do have a cause of action but not to seek damages so to stop whatever the unconstitutional or illegal act would be.